BARD RANCH COMPANY, a corporation, and Eldon Johnston, an individual, Appellants (Defendants below),

v.

Wayne WEBER and Evelyn Weber, Appellees (Plaintiffs below).

Wayne WEBER and Evelyn S. Weber, Appellants (Defendants below),

v.

JOHNSTON FUEL LINERS, INC., a Wyoming Corporation, and the Bard Ranch Company, a corporation, Appellees (Plaintiffs below) (two cases).

JOHNSTON FUEL LINERS, INC., a Wyoming Corporation, and the Bard Ranch Company, a corporation, Appellants (Plaintiffs below),

v.

Wayne WEBER and Evelyn S. Weber, Appellees (Defendants below).

Wayne WEBER and Evelyn S. Weber, Appellants (Plaintiffs below),

v.

BARD RANCH COMPANY, a corporation, and Eldon Johnston, an Individual, Appellees (Defendants below) (two cases).

Nos. 4472 and 4529 to 4533.

Supreme Court of Wyoming.

Dec. 14, 1976.

William R. Jones, Jones, Jones, Vines & Hunkins, Wheatland, for Bard Ranch Co., Eldon Johnston, and Johnston Fuel Liners, Inc.

Jack R. Gage, Hanes, Carmichael, Gage & Speight, P. C., Cheyenne, for Wayne and Evelyn S. Weber.

Before GUTHRIE, C. J., Mc-CLINTOCK, THOMAS and ROSE, JJ., and ARMSTRONG, District Judge, Retired.

McCLINTOCK, Justice.

By opinion dated March 7, 1974[1] this court affirmed the legal existence of a roadway easement traversing Section 21, T. 24 N., R. 67 W., 6th P. M., Platte County, Wyoming. Rather than ending the controversy our opinion was followed by two more actions, three applications for contempt, two of which were granted and one of which was denied, and the six appeals listed in the caption.[2] We would have preferred to render an opinion which would settle once and for all this unfortunate and we think unseemly bickering between two neighboring but not neighborly

---

1. *Weber v. Johnston Fuel Liners, Inc.,* 519 P.2d 972 (Wyo.1974). In order to avoid confusion, Mr. and Mrs. Weber, plaintiffs in both of the new actions, applicants for two of the contempt citations, and respondents in the third, will be referred to as "Weber"; Eldon Johnston and Bard Ranch Company, defendants in both of the new actions, and Johnston Fuel Liners, Inc., one of the plaintiffs in the original action, will all be included in the reference "Johnston."

2. Appeal No. 4472 was filed first and briefs were submitted separately in that case. The

others were taken as separate appeals but were consolidated for purposes of briefing. All six cases were consolidated for argument. Because of the close relationship of all appeals we think that they can properly be disposed of in one opinion. The sixth appeal results from the fact that Weber, successful applicant for contempt citation against Johnston, cross-appealed from the order. We shall refer more specifically to this appeal but do not consider that it raises any justiciable controversy.

landowners, but unfortunately we must require more determination of the factual situation by the district court.

As disclosed in our opinion in *Weber*, supra,[3] Johnston therein sought temporary and permanent injunctions against the installation of a gate across an existing private road in such a manner as to interfere with the safe and convenient use thereof by Johnston. Weber claimed that the right-of-way had been assigned to him by the owner thereof, being the grantee named in the original conveyance. Johnston claimed as successor in ownership of the lands for the benefit of which the right-of-way had been granted. The judgment of the trial court in Docket 12–177, being the only part of that action made a part of the record in the several proceedings with which we are now concerned, declared Johnston to be the owner of the right-of-way over lands of Weber in Section 21 as an appurtenance to undescribed lands owned by Johnston in the same township, and declared that an easement

"  *   *   *  is hereby established to be fifty (50) feet in width, being twenty-five (25) feet on either side of the *presently established and existing roadway traversing said section 21  *   *   *.*" (Emphasis added)

The judgment then went on to enjoin Weber from interfering with Johnston's use of the roadway and from "damaging, altering or changing the surface of said roadway *and the entire easement upon which the same is established.*" (Emphasis ours) Weber was permitted to maintain the cattleguard and gate which had led to the institution of the suit but was required to extend the approaches thereto in a straight line for a distance of 150 feet on each side

thereof. He was also permitted to maintain ramps for access from the roadway to his lands but only in such manner as to avoid accumulation of any water on the roadway.

Following entry of mandate upon affirmance and on May 24, 1974 Weber filed in the district court a new action, Docket 12–473, seeking to enjoin Johnston from interfering with a power pole and two ditches or laterals which were claimed either to be outside the right-of-way established by the district court's judgment in 12–177 or, if within such boundaries, to have been installed prior to the institution of that action by Johnston against Weber.[4] By judgment entered August 7, 1974, the district court enjoined Johnston from such interference, finding that while both the pole and laterals encroached upon the right-of-way, they had been installed prior to the institution of that suit. Appeal was taken by Johnston and that cause docketed in this court as No. 4472.

On November 15, 1974 Docket 12–540 was filed by Weber to enjoin interference with laterals or ditches adjacent to or within the boundaries of the right-of-way, but at locations further north than the one involved in appeal No. 4472. Johnston responded with a motion to dismiss this later suit which motion was sustained and the amended complaint dismissed by order entered January 13, 1975. Appeal by Weber from this order was docketed as No. 4533.

Three separate applications for contempt citations were filed: the first of these by Johnston on November 26, 1974 in Docket 12–177 to have Weber adjudged in contempt for violation of the judgment establishing the right-of-way;[5] a similar application by Weber filed December 12, 1974

---

3. Docket 12–177 in the district court and which number we shall use in referring to the original action.

4. The record is clear that the power pole and at least the upper portions of these two laterals or ditches are located in the SE/4 of Section 20, which section is not mentioned in the judgment of May 25, 1973 in 12–177.

5. Based on the alleged construction by Weber of a ditch or lateral within the limits of the right-of-way, the location of which is not more specifically described in the application or in the order finding Weber in contempt of the judgment dated May 25, 1973 in 12–177.

in Docket 12–177 to have Johnston adjudged in contempt; [6] and on the same date Weber's application in Docket 12–473 to have Johnston adjudged in contempt for violation of the injunction entered August 7, 1974.[7] By separate orders entered January 13, 1975, Weber was found guilty of contempt on the Johnston application and fined $500, Johnston was found guilty of contempt on the first Weber application and fined $500, and Weber's application in Docket 12–473 was denied. Appeals were taken by Weber from the order holding him in contempt, and by Weber and Johnston from the order holding Johnston in contempt, which appeals were respectively docketed herein as Nos. 4529, 4530, and 4531. Weber also appealed from the dismissal of his application for contempt against Johnston in Docket 12–473, which appeal was herein docketed as No. 4532.

Before separately considering the various appeals we shall make some general observations concerning the previous action and its relation to the pending actions and proceedings. As stated in Johnston's brief, the first action was

> " * * * instituted to enjoin Weber from interfering with Bard's right of way. Interference in that cause was related to the construction and maintenance of a cattle guard which impinged upon Bard's right of way."

Weber defended only on the basis that Johnston owned no right-of-way and the exact location of the roadway, either generally through Section 21 or at the specific location of the cattle guard, was not an is-

sue in the case. The judgment of the district court, which in part protected Johnston's ownership of the easement from obstruction by an improper cattle guard, did go on to enjoin Weber from damaging, altering or changing the roadway "or the entire easement upon which the same is established." While the judgment relied upon the original conveyance as the legal basis for claim of easement, it did not adhere to the description contained therein (being a definite courses-and-distances description tied in to established sections corners) and did not itself attempt to fix the boundaries thereof, but as stated above, declared the easement to encompass 25 feet "on either side of the presently established and existing roadway traversing said Section 21 * * *."[8]

Neither party objected to this and pertinently to the present case the only dispute posed for our consideration was the broad issue of ownership. We held only that the conveyance of the land for the benefit of which the easement had been obtained carried the easement with it as an appurtenance, and after passing upon other questions not germane to the present appeals affirmed the judgment.

With the final observation that not only was the judgment devoid of any legal description of the easement owned by Johnston but the civil engineers testifying for the opposing parties in the present proceedings have disagreed materially as to the location of the "presently established and existing roadway" and the boundaries of the right-of-way,[9] which disputes have

6. Based on the alleged interference by Johnston with Weber's access to and use of his land adjoining the right-of-way, the location or locations of which interference are not more specifically described in the application or in the order finding Johnston in contempt of the judgment dated May 25, 1973 in 12–177.

7. Based on alleged interference by Johnston with Weber's Nos. 1 and 2 laterals, contrary to the injunction issued in docket 12–473.

8. We interpret this, as apparently did counsel and the trial judge, as being 25 feet on each

side of the center line of the existing roadway.

9. It appears that this roadway existed through this area for a number of years, Johnston testifying that he was familiar with the area in 1945 and the road was then in existence. It also appears that the easement was granted when the ownership of Section 21 and probably Section 20 was separated from ownership of other lands in the township served by the roadway. While its existence is unquestioned, the evidence includes a survey map made by a licensed engineer in September of 1971, at Weber's in-

been only partially settled by findings of the district court, we proceed to consider the specific appeals.

*No. 4472—Injunction against Johnston's interference with pole and laterals*

Notwithstanding the limited factual and legal situation involved in the earlier judgment and affirmance, Johnston argues in support of his appeal in No. 4472 that the judgment is res judicata not only on the issues actually litigated and settled by the judgment, but upon all rights and obligations of the parties with respect to the easement, wherever it might extend. Citing 46 Am Jur 2d, Judgments § 395, p. 561 for the general proposition that under this doctrine one who "has litigated, *or had an opportunity to litigate,* the same matter in a former action" (emphasis ours) will not be permitted to litigate it again in a subsequent action, Johnston argues that it was incumbent upon Weber in the earlier action to present any evidence that might support his claims to an interest in poles, ditches or other improvements which might limit or restrict the easement anywhere along its course, and having failed to do so, the earlier judgment must be considered not only to have sustained the general validity of the easement and the effect of the gate, but also to have determined that Weber could have no other claims against Johnston as to the right-of-way throughout its entire course and wherever it might subsequently be factuallly determined to exist upon the ground. Upon this premise it is then argued that the independent action, 12–473, filed after our affirmance of 12–177, constituted a collateral attack by Weber upon that final judgment which cannot be permitted.

This contention is made despite the fact that Johnston, contrary to the requirements of Rule 8(c), W.R.C.P.[10] did not affirmatively plead in defense of Weber's suit (12–473) that the matter was res judicata. We are also impressed with the fact that the judgment claimed by Johnston to have adjudicated the question of Weber's right to maintain the pole and laterals says nothing about any roadway or easement in Section 20. While it seems reasonable to surmise that there is only one right-of-way extending through both Sections 20 and 21, sustention of Johnston's argument would involve us in a correction and amendment of that earlier judgment without application therefor, either to this court or to the district court.

More importantly perhaps, and with more pertinence to Johnston's argument herein, we think that the principles of res judicata are not applicable so as to bar the present action. Johnston's complaint that Weber seeks collaterally to attack the judgment is, we think, not well founded because the judgment at no place establishes a definite location of the right-of-way, nor does it purport to settle claims as to any existing possible obstructions or encroachments thereof other than the cattle guard. If we assume that other claimed or possible installations might have been brought into the action by either party, they were not, and the language of the judgment cannot by the broadest interpretation thereof be construed to require Weber to remove existing obstructions or encroachments wherever they might be found to exist. We cannot consider the former judgment as dispositive of any claim that

stance and shortly after 12–177 was filed, which indicates material variances between the roadway described in the grant and as it was found on the ground. There were also partial surveys at particular points made in 1974 by two licensed engineers separately retained by the litigants. The last two men did not agree in all respects as to the proper boundaries of the roadway as they were found in 1974. Mr. Kennedy, testifying as a witness for Johnston, said: "It is difficulty

[sic] as Mr. Smith stated this morning you would have to measure from the edge of the grass and weeds and assume that is the travelway and then find the center of it. * * * You can get reasonably close."

10. Rule 8(c), W.R.C.P. provides in pertinent part: "*Affirmative Defenses.* In pleading to a preceding pleading, a party shall set forth affirmatively * * * res judicata * * * ."

might have been brought into the litigation but was not.

Two decisions of the Supreme Court of the United States appear to us to be particularly pertinent and establish the principles that must govern us. In the earlier case, *Cromwell v. County of Sac*, 94 U.S. 351, 353, 24 L.Ed. 195 (1876), the Court discusses the difference between effect of a judgment as a bar against the prosecution of a second action upon the same claim and its effect as a bar in another action between the same parties upon a different claim or cause of action. The decision is referred to and quoted from in *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 597–598, 68 S.Ct. 715, 719, 92 L. Ed. 898 (1947), and we quote from that later opinion:

"It is first necessary to understand something of the recognized meaning and scope of *res judicata*, a doctrine judicial in origin. The general rule of *res judicata* applies to repetitious suits involving the same cause of action. It rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195. The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment. * * *

"But where the second action between the same parties is upon a different cause or demand, the principle of *res judicata* is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' *Cromwell v. County of Sac, supra,* 353. * * * Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, *res judicata* is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. See Restatement of the Law of Judgments, §§ 68, 69, 70; Scott, 'Collateral Estoppel by Judgment,' 56 Harv.L.Rev. 1."

█ This court, in *Willis v. Willis*, 48 Wyo. 403, 416, 49 P.2d 670, 673 (1935), reh. den., 49 Wyo. 296, 54 P.2d 814 (1936), a decision that was rendered in the interim between the two federal Supreme Court decisions, refers to *Cromwell* in the course of an extensive discussion of the principles of res judicata and we think enunciates principles entirely consistent with the position we have taken, namely, that only those facts and matters involved in the prior suit which were actually or necessarily adjudicated are conclusively established.

█ Applying these principles to the case at Bar, we may say that the parties first litigated the ownership of the easement and legality of a specific object claimed unreasonably to obstruct and interfere with Johnston's use of that right-of-way. Johnston could at that time have tendered an issue as to the ditches and power pole which were the subject of the present suit instituted by Weber, but he did not choose to do so. He could have sought

to establish the boundaries of the right-of-way throughout its entire length and to establish that any obstruction or encroachment, however trivial, was an illegal and improper interference with his right-of-way, but he did not choose to do this. Essential to the recovery which he obtained was the question of the general legality of the right-of-way, that is, was Johnston the owner of a valid right-of-way at the point where the obstruction occurred? Since the defense was that Weber had obtained a deed of this right-of-way which allegedly had not passed as an appurtenance of the land for whose benefit it was obtained, adjudication of that suit necessarily resulted in elimination of any defense, at that time or in the future, involving that same issue, but the location of the right-of-way throughout its length was not involved and actually the judgment did not even establish that it legally existed in Section 20. We may say then that Weber is estopped by the judgment to attack it insofar as it establishes ownership in Johnston of the right-of-way. The judgment did not adjudicate and Weber is not estopped to litigate questions as to the location of the right-of-way on the ground at other places than the one for the gate. Similarly he is not estopped to claim that alleged obstructions in existence at the time of the first judgment were not a legal interference with Johnston's rights in the roadway.

The court also held that the line of the right-of-way was not as originally described in the deed creating the same but was as it had been established through the action of the parties over the years. We do not know on what theory this was done but since it is now shown that the line of the right-of-way was materially different, according to the established road, than it had been described in the courses and distances description in the conveyance, and the parties did not on appeal raise any question concerning that phase of the judgment, we must now conclude that that issue was settled by the former law suit and Weber is similarly estopped to attack the judgment that it is the right-of-way as established on the ground and not as described in the conveyance that governs.

We therefore hold that the principle of res judicata as advanced by Johnston, or collateral estoppel by judgment as the federal Supreme Court prefers to call it, is applicable in this case only to establish that Johnston was the owner of a right-of-way in Section 21 (and perhaps Section 20) as a subsequent investigation and determination of the facts might establish where it existed on the ground. It also adjudicated that the particular gate was an improper obstruction thereof. It did not adjudicate either expressly or by implication that a power pole .8 feet within and laterals a short distance within the outside boundaries of the right-of-way were improper. The trial court was therefore free in the later case to determine whether there was a legal encroachment by the pole and ditches.

It is not clear on just what theory the trial court held that these encroachments upon the right-of-way, as he found them to exist at the time of the institution of the action in 12–177, operated to give the adjoining landowner the complete right to maintain them. It seems logical that if the court is to ignore the right-of-way as described in the grant and protect it as established through actual use upon the ground, this must be on a theory of mutual acquiescence by the dominant and servient owners; and if the landowner has agreed to the change of the roadway from the course described in the grant, is it not equally reasonable to infer that the easement owner, changing such course, agrees to the uses made by the landowner at some undisclosed time during the establishment of the course of the easement by use? This part of the judgment is not attacked in this court and since we have rejected Johnston's argument that the right-of-way question had been settled for all purposes in the previous suit, we affirm the judgment in case No. 4472.

*No. 4533—Dismissal of Weber's Complaint in 12–540*

By this separate action Weber sought preliminary and permanent injunctions against work which Johnston proposed to do upon the roadway at a location different from that of the cattle guard and gate and which Weber claimed would improperly interfere with ditches or laterals constructed by him. An evidentiary and reported hearing on the application for preliminary injunction was held November 20, 1974, at the close of which the court orally announced that the application would be denied. Following this and on November 20 Johnston filed a motion to dismiss the complaint for failure to state a claim and because the matter was res judicata.

On December 11 Weber filed an amended complaint alleging that after the hearing on the preliminary injunction Johnston had performed reconstruction work upon the roadway; that this reconstruction caused serious and irreparable harm to Weber in that it had deprived his lands of lateral support to which they were entitled; that the reconstructed roadway exceeded 50 feet in width, thereby taking Weber's property without due process of law in violation of Art. 1, §§ 6 and 32 of the Wyoming Constitution; that the manner of construction had created serious safety hazards that did not previously exist, both on the roadway and on the adjoining lands; and that the construction made impossible or impractical the use of some of Weber's ditches lying outside the right-of-way. The prayer was that Johnston be required to restore the roadway to its former condition, that he be enjoined from future construction not in keeping with the origi-nal conveyance and the earlier order of the court in Docket 12–177, and that the court retain jurisdiction for the purpose of determining any damages suffered by Weber during the period of reconstruction.

The matter was heard on December 18, in connection with or about the same time that an evidentiary and reported hearing was held with respect to the three applications for contempt citations mentioned above and which we shall later discuss in more detail. As has already been stated, by judgment of dismissal dated January 6 and entered January 13, 1975, the filing of the amended complaint was permitted, the motion to dismiss was treated as filed thereagainst, and the amended complaint was dismissed.

Although the judgment of dismissal recites only that the matter came on for hearing upon the arguments of counsel and makes no reference to any evidentiary hearing or findings of fact based upon evidence, opposing counsel set forth at length their conflicting interpretations of conflicting evidence presented at the two hearings and would have us reverse or affirm the dismissal upon the basis of their interpretations. Johnston further objects that certain theories of Weber's were not "mentioned or raised during the trial of this case." We are at a loss to understand this reference as we do not find where a trial of this case was held,[11] but even if it be considered that the two evidentiary hearings were sufficient to develop all the facts pertinent to Weber's right to a permanent injunction against acts of Johnston, that fact cannot justify final judgment of this court in favor of either Johnston or Weber because the district court has made no

---

11. The record in appeal No. 4533, certified by the clerk of the district court as being the entire record in 12–540 in that court, contains transcript of proceedings on application for preliminary injunction heard on November 20, 1974 in 12–540, and subsequent proceedings in 12–177 and 12–473 held December 18, 1974. Counsel for the parties refer to a "stipulation" concerning use of the evidence but, as shown in the transcript, at the close of Johnston's case in his application for contempt citation against Weber in 12–177 the trial judge stated that "the parties have agreed that the testimony may be considered in all three of the pending contempt proceedings and that it need not be repeated where it would be repetitious in subsequent proceedings, all of which are being held concurrently."

findings thereon and did not dispose of the action upon its factual merits. Counsel's arguments disclose only that there existed a situation where the basic and determinative facts were in direct dispute, requiring findings of fact and application of legal principles by the district court. For us to decide these questions of fact would make this court the original trier of the fact, a role which we have consistently refused to assume.[12]

That the amended complaint states facts sufficient to constitute a claim and to require a factual trial and a judgment based upon either general or special findings of fact seems to us hardly arguable. Johnston's argument to the contrary, in addition to being based upon his interpretation of conflicting evidence not passed upon by the trial court, appears in large measure to be based upon that assumption that he, as the owner of the easement, had the absolute and exclusive right to use the full area of land within the boundaries of the grant, as he saw fit and to the exclusion of any rights therein of Weber, with the possible exception of a very limited right of passage by Weber. This court does not appear to have passed on the questions raised in this appeal but it is said in 2 Thompson on Real Property (1961 Repl.) § 426, p. 692, that "[a]n 'exclusive easement' is an unusual interest in land; it has been said to amount almost to a conveyance of the fee." In *City of Pasadena v. California-Michigan Land & Water Co.*, 17 Cal.2d 576, 110 P.2d 983, 985, 133 A.L.R. 1186 (1941), it is said that "[n]o intention to convey such a complete interest can be imputed to the owner of the servient tene-

ment in the absence of a clear indication of such an intention."

"* * * An owner of land who grants a right of way over it conveys nothing but the right of passage and reserves all incidents of ownership not granted; he may make any use of his land that does not interfere substantially with the created easement. [Citing cases]" *Edwards v. Julian*, 192 Pa.Super. 121, 159 A.2d 547, 549 (1960)

This and other cases cause Thompson to conclude that "[a]ny incident of ownership not inconsistent with easement and enjoyment of same is reserved to the grantor." 2 Thompson on Real Property (1961 Repl., 1976 Supp.) p. 70.

Both owners possess rights and each must as far as possible respect the other's use. As stated in 25 AmJur2d Easements and Licenses § 72, p. 478:

"* * * Though the rights of the easement owner are paramount, to the extent of the easement, to those of the landowner, the rights of the easement owner and of the landowner are not absolute, irrelative and uncontrolled, but are so limited, each by the other, that there may be a due and reasonable enjoyment of both the easement and the servient tenement. The owner of the easement is said to have all rights incident or necessary to its proper enjoyment, but nothing more. And, if he exceeds his rights either in the manner or in the extent of its use, he becomes a trespasser to the extent of the unauthorized use."

Both parties contend, with apparent basis in the record,[13] that the other has changed

---

12. "* * * This court is primarily a court of review * * *. It is not its function to determine the facts and the law in a case in the first instance. That must be done by the trial court." *Buckman v. United Mine Workers of America*, 80 Wyo. 199, 213, 339 P.2d 398, 402, reh. den., 80 Wyo. 216, 342 P.2d 236 (1959).

13. References to the evidence are not made for the purpose of confirming that any fact did

or did not exist but only to show that there were substantial conflicting questions of fact, necessitating findings by the trial court. Our reference to any evidence should not in any way be taken as an attempt to influence the findings that will eventually be made by the trial court.

the manner of his use of the right owned by him. Weber has sought to cultivate and irrigate land which at the time of the grant was used as grazing land; he has constructed ditches and laterals as close to the roadway as he can in order that all suitable land can be cultivated and used to produce crops. Johnston has substantially raised and widened the road in some places so that Weber contends that he has constructed an entirely new road. One witness testified that previous to Johnston's acquisition of the Bard ranch the roadway had been used for many years without substantial change as an ordinary roadway. Johnston himself testified that he had for some years moved large amounts of livestock, grain and foodstuffs along the roadway (without apparent difficulty) but that he had put in a roadway of 23 feet in width and needed room for a 12-foot scraper on each side so "that takes up the total of 50 feet of the right-of-way." It was his intention, at least partially carried out, to take land from within the right-of-way to use for building up the grade of the road. His need for such a road is not readily apparent and when asked for what reason he objected to the existence of laterals on the right-of-way he replied that he needed the dirt to raise the levels of the present roadbed and "its our property and it should not be used without our consent."

Again quoting from American Jurisprudence:

"The rights of any person having an easement in the land of another are measured and defined by the purpose and character of the easement. A principle which underlies the use of all easements is that the owner of the easement cannot materially increase the burden of the servient estate or impose thereon a new and additional burden. * * *" 25 AmJur2d Easements and Licenses § 72, p. 478.

■ We do not want our opinion to be construed as freezing the permissible use of either the easement or adjacent lands strictly to the manner of use that was being made at the time of the grant. After construing the grant as creating a general easement the court said in *Cameron v. Barton*, 272 S.W.2d 40, 41 (Ky.1954):

"* * * This being so, the passway may be used in such a manner as is necessary in the proper and reasonable occupation and enjoyment of the dominant estate. * * * As the passage of time creates new needs and the uses of property change, a normal change in the manner of using a passway does not constitute a deviation from the original grant, and modern transportation uses are not restricted to the ancient modes of travel. * * *"

The Supreme Court of Oregon expresses the rule in *Jones v. Edwards*, 219 Or. 429, 347 P.2d 846, 848 (1959):

"* * * Unless the language of the creating instrument or the attending circumstances at the time of the grant indicate a contrary intent, the scope of an easement is not limited to the uses contemplated to be made at the time of or immediately after its creation, either with respect to the permissible uses of the easement or with respect to the permissible uses which may be made of the servient land by the servient owner. In the absence of a contrary intent both the uses of the dominant and servient owners are subject to adjustment consistent with the normal development of their respective lands. * * * The servient owner 'is privileged to make such uses of the servient tenement as are not inconsistent with the provisions of the creating instrument' and in the application of this principle the servient owner's use of his land 'may vary as the respective needs of himself and the owner of the easement vary.' 5 Restatement, Property (Servitudes) 3027, § 486. [Citing other authorities]"

■ Weber has claimed a right of lateral support, citing *Sanders v. State Highway Commission*, 211 Kan. 776, 508 P.2d 981 (1973). In addition to the objection

concerning failure to raise the question upon the "trial" of the case, Johnston contends such a claim is premature in that no subsidence or injury to the adjacent land had been proved and cites the rule that a landowner does not suffer damages recoverable at law for injury to lateral support of his property until the earth is so much disturbed that is slides or falls. *Kansas City Northwestern Railroad Company v. Schwake,* 70 Kan. 141, 78 P. 431. Conceding that Weber could not recover damages until there had been actual injury, it does not follow that he had to sit back until his property was injured, perhaps irreparably, and then file a damage claim. As is said in 5 Powell on Real Property (1976 Ed.) § 701, p. 296:

"When the owner of land entitled to support sees that his neighbor is disregarding his duty, he is not compelled to await disaster and then seek compensation. He is permitted to make expenditures designed to safeguard his premises and thereafter to recover these necessary costs from the delinquent neighbor. On a showing of threatened irreparable damage, he can secure equitable intervention to enjoin further excavation. * * *"

■ As previously noted, we have not examined the evidence in this case to determine what factual finding it would support. We do not know if the evidence which has been or might be brought forward in this case would sustain Weber's claim of irreparable injury by deprivation of lateral support but we conclude that Weber had the right to have that factual issue presented to the decision of the district court. We may properly conclude that important factual questions exist as to the extent to which Johnston has actual and reasonable need of an easement of the width and nature claimed by him to the exclusion of any use whatsoever by Weber. We do not think that in such use Johnston would be prevented from using modern cattle transports, but neither do we think that he would be entitled to make a super-

highway out of this country road. Similar questions exist as to the extent to which Weber must curb his activities within this right-of-way area or upon adjacent land in order to assure the proper use of the easement. As said in 25 AmJur2d Easements and Licenses § 74, p. 480:

"No definite rule can be stated as to what may be considered a reasonable use as distinguished from an unreasonable use. The question is usually one of fact, to be determined in the light of the situation of the property and the surrounding circumstances."

In similar vein, id. § 90, p. 496:

"Ordinarily, what may be considered a proper use by the servient owner is a question of fact and depends largely on the extent and mode of user of the particular easement."

We therefore reverse the order of dismissal of the amended complaint in this case and remand the cause for further proceedings consistent with this opinion.

*Nos. 4529, 4530, 4531, and 4532—*
*The Contempt Appeals*

Perhaps because of an overweening desire of each party to vindicate his own obstinacy, which attitude may have in small measure permeated the judgment of counsel, neither explores the theories and purpose of contempt proceedings in the depth that we would have preferred. Each attacks with more vigor than citation of authority the judgment of contempt against his client while similarly defending the contempt judgment against the other party. We shall attempt to dispose of the appeals on more acceptable principles.

■ Many years ago the Supreme Court of the United States said in *California Paving Co. v. Molitor,* 113 U.S. 609, 617, 5 S.Ct. 618, 622, 28 L.Ed. 1106 (1885):

" * * * Process of contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct."

Much later, and in *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967), the same Court said:

"The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid. Because the decree of this District Court was not so framed, it cannot stand. And with it must fall the District Court's decision holding the union in contempt. We do not deal here with a violation of a court order by one who fully understands its meaning but chooses to ignore its mandate. We deal instead with acts alleged to violate a decree that can only be described as unintelligible. The most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension."

It was said in *Ford v. Kammerer,* 450 F.2d 279, 280 (3 Cir. 1971) that the question whether a preliminary injunction was issued upon a correct view of the law is not material in a contempt citation but that "it need be obeyed only to the extent it reasonably specifies the conduct prohibited." (citing Rule 65(d), F.R.C.P.),[14] and concludes:

" * * * The long-standing, salutary rule in contempt cases is that ambiguities and omissions in orders ⸰redound to the benefit of the person charged with contempt."

The last pronouncement of the federal Supreme Court which we have found appears equally pertinent to this case. In *Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974) it is said:

"As we have emphasized in the past, the specificity provisions of Rules 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. [Citing authorities] * * *"

Examination of the judgment in 12–177 discloses no attempt to comply with that provision of Rule 65(d) requiring the statement of reasons for the issuance of any injunctive relief. It is reasonable to assume that the court was there concerned only with the broad question of ownership and interference with the use of the right-of-way at the specific point of the cattle-guard and gate. The judgment permits the gate but requires Weber to extend the approaches thereto. A declaration of ownership of the right-of-way generally and protection against an improper obstruction thereof were the forms of relief sought by Johnston, but we find nothing in the judgment or our former opinion that indicates any need for the broad form of injunction contained in the judgment.

Admittedly, the authorities previously cited are not directly in point to the situation presented in these appeals. The judgment in 12–177 enjoined Weber from "damaging, altering or changing the surface of the roadway and the entire easement upon which the same is established."[15]

---

14. Our Rule 65(d), W.R.C.P. is identical to the federal rule mentioned in *International,* supra, and requires that "[e]very order granting an injunction * * * shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought ‚to be restrained; * * *."

15. The language of the judgment is unfortunately broad and may be well outside the issues raised by the pleadings in that case. We do not have them before us but it appears that at the time ‚the judgment was drawn Weber's counsel had withdrawn and he did not have the benefit of legal advice in the consideration of the form of judgment to be entered by the trial court. New counsel have since represented him.

But it was not based upon the description of the right-of-way as contained in the grant and described no different course, other than an "existing roadway." Moreover, no directions were given as to how the location of this existing roadway, shown by other evidence in the case to be materially different in its course from that described in the grant and dependent upon different judgment calls by experienced surveyors[16] would be determined.

To sustain the judgment of contempt against Weber, then, we must hold that before he could do any work in close proximity to the "existing roadway" he was required at his peril to determine an area 50 feet in width and some 7,300 feet in length. He would have to do this by determining the edges of the existing roadway by two lines of weeds or grass, finding the center of that strip and then measuring out 25 feet on each side thereof. In view of the way in which trained surveyors have differed as to the location of this area, this presented a very real risk that an honest mistake in judgment or mere dispute as to observed conditions would result in serious consequences. In order to be safe before doing any work Weber would have had to present his surveyor's determination to the court, present evidence on any disputed points, and secure a judgment of the court fixing the boundaries. Although we have already indicated that in view of the unfriendly and uncooperative attitude that has developed this procedure will be necessary, we cannot agree that either party should be held in contempt for activities within or outside this presently indefinite right-of-way.

■■■ We do not think that one can be properly found to be in contempt of an injunction when he has done acts that can be found to be in violation thereof only by resolving differences of opinions between three surveyors who have examined the ground and have disagreed as to the location of the critical area. We therefore believe that the original judgment in 12–177 possesses the same impermissible vagueness as in the cited authorities and for that reason could not justify the judgment of contempt that was entered against Weber in 12–177. We therefore reverse this Appeal No. 4529.

By his own admission Weber's appeal No. 4530 was merely for the purpose of preserving a record in connection with Johnston's citation for contempt in 12–177, appealed as 4531. The record has been preserved. No reason for reversal of the judgment of contempt, other than reversal at the behest of Johnston, has been cited by Weber, and we therefore dismiss his appeal in 4530.

Disposition of No. 4531 is even easier in that the judgment itself imposes no duties upon Johnston and it cannot be said that Johnston has done anything in violation of the order of the court. Whether he has performed acts upon an area of land that was not included in the right-of-way or has improperly performed other acts within that area remains a question in the proceedings, but it cannot be said that he is in contempt of the judgment of May 25, 1973. We therefore reverse the holding of contempt in that case.

What we have said with respect to the uncertainties of the location of the right-of-way applied with equal force to Weber's appeal in 4532. A dispute exists as to whether Johnston did any work that interfered with Weber's maintenance of canal No. 1, but whatever the truth of the situation serious questions of fact exist and the judgment in docket 12–473 was not sufficiently explicit to permit the finding of a contemptuous violation thereof by Johnston. We therefore affirm the trial court's refusal to cite Johnston for contempt in this instance.

### Summation

If these unneighborly neighbors are to continue their prolonged and unseemly

16. See note 8, supra.

quarrel, it appears to us that the location of the right-of-way should be definitely established by a legal survey establishing the boundaries thereof in a manner that will be obvious to all and perhaps made a matter of record in the office of the County Clerk. We have no doubt that establishment of the boundaries of the existing roadway as it existed on May 25, 1973 may be a difficult task and it would be our hope that in the interests of economy, if not amity, the parties would make some attempt to reconcile their asserted needs and establish a roadway that would respect the rights of the adjacent and servient estate while at the same time permitting the full and proper use of the right-of-way by Johnston. Perhaps the $500 that each saves by reason of our reversal of their contempt judgments will help to defray the cost of properly locating and describing this right-of-way.

In any event, we think that there are questions of fact that must be decided by the district court under the broad principles that we have attempted to enunciate. The judgments of the district court are reversed or affirmed as hereinabove stated and the proceedings are remanded to the district court with directions to proceed in a manner consistent with this opinion.