INTERNATIONAL LONGSHOREMEN'S ASSOCIA-
TION, LOCAL 1291 *v.* PHILADELPHIA
MARINE TRADE ASSOCIATION.

No. 34.   Argued October 12 and 16, 1967.—
Decided November 6, 1967.*

---

*Together with No. 78, *International Longshoremen's Association,
Local 1291, et al.* v. *Philadelphia Marine Trade Association,* also on
certiorari to the same court.

*Abraham E. Freedman* argued the cause for petitioners in both cases. With him on the briefs was *Martin J. Vigderman.*

*Francis A. Scanlan* argued the cause and filed a brief for respondent in both cases.

*Edward Silver* and *George G. Gallantz* filed a brief for the Maritime Service Committee, Inc., et al., as *amici curiae,* urging affirmance in both cases.

MR. JUSTICE STEWART delivered the opinion of the Court.

These cases arise from a series of strikes along the Philadelphia waterfront. The petitioner union, representing the longshoremen involved in those strikes, had entered into a collective bargaining agreement in 1959 with the respondent, an association of employers in the Port of Philadelphia. The agreement included provisions for compensating longshoremen who are told after they report for duty that they will not be needed until the afternoon.[1] The union construed those "set-back" provi-

---

[1] The 1959 agreement provided in Article 9 (a) that "Men employed from Monday to Sunday, inclusive, shall be guaranteed four (4) hours' pay for the period between 8:00 A. M. and 12:00 Noon, regardless of any condition." Article 9 (h) provided that "If a ship is knocked off on account of inclement weather by the Ship's Master or his authorized representative, the men will be paid the applicable guarantee, but in the event the men knock off themselves, they will be paid only for the time worked, regardless of guarantee provided for in this Agreement."

A Memorandum of Settlement, effective October 1, 1964, provided in Article 10 (5) that "[f]or work commencing at 8 AM on Monday or at 8 AM on the day following a holiday," employers

sions to mean that, at least in some situations, longshore-men whose employment was postponed because of unfavorable weather conditions were entitled to four hours' pay; the association interpreted the provisions to guarantee no more than one hour's pay under such circumstances.

In April 1965, when this disagreement first became apparent, the parties followed the grievance procedure established by their collective bargaining contract and submitted the matter to an arbitrator for binding settlement.[2]  On June 11 the arbitrator ruled that the

---

would "have the right because of non-arrival of a vessel in port to cancel the gangs by 7:30 A. M."  Article 10 (6) then stated: "Gangs ordered for an 8 AM start Monday through Friday can be set back at 7:30 AM on the day of work to commence at 1 PM at which time a four hour guarantee shall apply.  A one hour guarantee shall apply for the morning period unless employed during the morning period."

Article 16 of the Memorandum of Settlement adopted the provisions of the 1959 agreement by reference, with the proviso that, in cases of conflict, "the provisions of [the Memorandum] shall prevail."

[2] Article 28 of the 1959 agreement, unchanged by the Memorandum of Settlement, provided:

"All disputes and grievances of any kind or nature whatsoever arising under the terms and conditions of this agreement, and all questions involving the interpretation of this agreement other than any disputes or grievances arising under the terms and conditions of paragraph 13 (d) hereof, shall be referred to a Grievance Committee, which shall consist of two members selected by the Employers and two members selected by the Union. . . .  Should the Grievance Committee be unable to resolve the issue submitted and should neither party request an immediate decision from the Arbitrator, then the grievance or dispute shall be submitted to a Joint Grievance Panel consisting of three representatives of the Association and three representatives of the Union.  To the end that there shall be no work interruptions and to the end that there shall be limited necessity for arbitration, the Panel shall make every effort to resolve all grievances or disputes which could not be resolved by the Grievance Committee. . . .  Should the Panel be unable to resolve

association's reading of the set-back provisions was correct.[3] In July, however, a group of union members refused to unload a ship unless their employer would promise four hours' pay for having set back their starting ·

a grievance or dispute which arose in the previous two weeks, or be unable to resolve a grievance or dispute anticipated in the ensuing two weeks, the dispute or grievance, including matters of interpretation of the contract, shall be referred to an Impartial Arbitrator who shall be selected to serve for a period of one year from a panel of five arbitrators to be submitted by the American Arbitration Association. . . . The Arbitrator thus selected shall conduct his hearings and procedures in accordance with the Rules of the American Arbitration Association, except that he shall be obliged to render his decision within forty-eight hours of the conclusion of his hearings or procedures. . . . Should the terms and conditions of this agreement fail to specifically provide for an issue in dispute, or should a provision of this agreement be the subject of disputed interpretation, the Arbitrator shall consider port practice in resolving the issue before him. If the Arbitrator determines that there is no port practice to assist him in determining an issue not specifically provided for in the collective bargaining agreement, or no port practice to assist him in resolving an interpretation of the agreement, the issue shall become the subject of negotiation between the parties. There shall be no strike and no lock-out during the pendency of any dispute or issue while before the Grievance Committee, the Joint Panel, or the Arbitrator."

[3] The text of the arbitrator's award was this:

"The contention of the Employer, the Philadelphia Marine Trade Association, is hereby sustained and it is the Arbitrator's determination that Section 10 (6) of the Memorandum of Settlement dated February 11, 1965, providing gangs 'ordered for an 8 AM start Monday through Friday can be set back at 7:30 AM on the day of work to commence at 1 PM, at which time a 4 hour guarantee shall apply. A 1 hour guarantee shall apply for the morning period unless employed during the morning period,' may be invoked by the Employer without qualification.

"The contention of the Union, the International Longshoremen's Association, Local No. 1291, that Section 10 (6) of the Memorandum of Settlement dated February 11, 1965, referred to above, can only be invoked by the Employer because of non-arrival of a vessel in port, is denied."

time from 8 a. m. to 1 p. m. The union sought to arbitrate the matter, but the association viewed the original arbitrator's decision as controlling and instituted proceedings in the District Court to enforce it. The complaint alleged that the union had refused "to abide by the terms of the Arbitrator's Award . . . resulting in serious loss and damage to [the] Employer . . . and to the Port of Philadelphia." This refusal, the complaint charged, constituted "a breach of the applicable provisions of the current Collective Bargaining Agreement between the P. M. T. A. and the Union." The complaint concluded with a prayer "that the Court set an immediate hearing and enter an order enforcing the Arbitrator's Award, and that plaintiff may have such other and further relief as may be justified."

Before the court could take any action, the employer had met the union's demands and the men had returned to work. The District Court heard evidence in order to "put the facts on record" but concluded that the case was "moot at the moment" and decided simply to "keep the matter in hand as a judge [and] take jurisdiction . . . [i]f anything arises." A similar situation did in fact arise—this time in September. Again, before the District Court could act, the work stoppage ended. The association nonetheless requested

> "an order . . . to make it perfectly clear to the [union] that it is required to comply with the Arbitrator's award because we cannot operate in this port if we are going to be continually harassed by the Union in taking the position that they are not going to abide by an Arbitrator's award . . . ."

Counsel for the union rejected that characterization of its position. He submitted that the set-back disputes of July and September were distinguishable from the one which occurred in April, and that the arbitrator's deci-

sion of June 11, 1965, resolving the April controversy, was not controlling.[4] The District Court expressed no opinion on any of these contentions but simply entered a decree, dated September 15, 1965, requiring that the arbitrator's award "issued on June 11, 1965, be specifically enforced." The decree ordered the union "to comply with and to abide by the said Award." It contained no other command.[5]

---

[4] The union's position in this regard was twofold. It maintained, first, that even if the July and September disputes had been factually identical to that of April, it was "quite clear . . . from past practice and from the agreement itself that . . . the award as to [any given] dispute relates only to that dispute and is not controlling so far as any future dispute is concerned." The union contended, second, that the disputes were factually different in at least one crucial respect: In the later disputes, the longshoremen were not notified of the set-back by 7:30 a. m., as required by Article 10 of the Memorandum of Settlement. The arbitrator's award, by its own terms, dealt only with situations in which longshoremen were "set back at 7:30 a. m." Counsel for the association seemingly agreed that the question of notice thus presented an independently arbitrable issue. He said: "[T]he factual issues as far as whether or not there was notice . . . should be brought up under the grievance procedure which is in the contract." "The question of notification," he agreed, "was not a matter in the arbitrator's award." He stated that the time and method of notification had not changed from April to September but he conceded that the problem "was never brought to [the arbitrator's] attention by the parties." On this basis, counsel for the union said that his adversary had "admitted on the stand that this situation goes beyond the arbitrator's award." The District Judge thought otherwise: "You have added words to his mouth, my dear boy, and that you can't do."

[5] The full text of the decree was this:

"ORDER—September 15, 1965

"And Now to Wit, This 15th day of September, 1965, after hearing, it is hereby ordered, adjudged and decreed that the Arbitrator's Award in the matter of arbitration between the Philadelphia Marine Trade Association and International Longshoremen's Association Local 1291, issued on June 11, 1965, be specifically enforced by

When the District Court first indicated that it would issue such a decree, counsel for the union asked the court for clarification:

"Mr. Freedman: Well, what does it mean, Your Honor?

"The Court: That you will have to determine, what it means.

"Mr. Freedman: Well, I am asking. I have to give my client advice and I don't know what it means. I am asking Your Honor to tell me what it means. It doesn't—

"The Court: You handled the case. You know about it. . . .

"Mr. Freedman: I am telling you very frankly now I don't know what this order means, this proposed order. It says, 'Enforcement of the award.' Now, just what does it mean? . . . The arbitration . . . involved an interpretation of the contract under a specific set of facts . . . . Now, how do you enforce it? That case is over and done with. These are new cases. Your Honor is changing the contract of the parties when you foreclose them from going to arbitration on this point again."

"The Court: The Court has acted. This is the order.

"Mr. Freedman: Well, won't Your Honor tell me what it means?

"The Court: You read the English language and I do."

Although the association had expressly told the District Court that it was "not seeking to enjoin work stop-

---

defendant, International Longshoremen's Association Local 1291, and the said defendant is hereby ordered to comply with and to abide by the said Award.

"By the Court.

"Ralph C. Body, J."

pages," counsel for the union asked whether the decree might nonetheless have that effect:

"Mr. Freedman: . . . Does this mean that the union cannot engage in a strike or refuse to work or picket?

"The Court: You know what the arbitration was about. You know the result of the arbitration.

. . . . .

"I have signed the order. Anything else to come before us?

"Mr. Freedman: I know, but Your Honor is leaving me in the sky. I don't know what to say to my client.

"Mr. Scanlan: No, I have nothing further, Your Honor.

"The Court: The hearing is closed."

Thus, despite counsel's repeated requests, the District Judge steadfastly refused to explain the meaning of the order.

When further set-back disputes disrupted work throughout the Port of Philadelphia in late February 1966, the District Court issued a rule to show cause why the union and its officers should not be held in contempt for violating the order of September 15. Throughout the contempt hearing held on March 1, 1966, counsel for the union sought without success to determine precisely what acts by the union, its officers, or its members were alleged to have violated the court's order. "We have a right to know," he said, "what it is that we are being accused of . . . ." The District Judge refused to comment.[6]

---

[6] At the hearing following the July work stoppage, the District Judge had agreed that, as to factual situations going "beyond the arbitrator's award, the union is not bound." The union thus attempted to prove at the contempt hearing on March 1 that the February disputes, like those of the previous July and September, went beyond the arbitrator's award in that they raised a separate

At some points in the proceedings, it appeared that the alleged violation consisted of the work stoppage during the last few days of February; but at other times the inquiry focused upon the union's request for a grievance meeting on February 28 to discuss the latest set-back problem. "Why," counsel for the association asked, did the union seek "to rearbitrate the award . . . ?" As the contempt hearing drew to a close, counsel for the association suggested yet another possibility—that union officials violated the District Court's decree when they "castigated" the arbitrator's award and failed to "tell [the men] that their work stoppage was unauthorized" under the award entered some eight months earlier. "[I]n failing to do that," counsel said, "they have shown that they do not intend to abide by the arbitrator's award which was the essence of the order which Your Honor issued . . . ."

Invited to make a closing argument, counsel for the union said:

> "I really don't know what to address myself to because I don't know what it is we are being charged with. Are we being charged because we want to arbitrate or because we asked to invoke the provisions or are we being charged for something else? . . .
>
> "I may say to Your Honor that we have been shooting in the dark here now, trying to guess at what may be an issue . . . ."

But the District Judge evidently felt no need for explanation. After a short recess, the court announced that the dock strike was "illegal . . . under the circumstances," and that the union had "violated the order of this Court and therefore shall be adjudged in civil contempt."

---

question of notice. Cf. n. 4, *supra*. The District Judge did not comment upon this aspect of the case in holding the union guilty of contempt.

After extending the contempt holding to "the officers and the men who participated," the court fined the union $100,000 per day, retroactive to 2 p. m., March 1, 1966, when the contempt hearing began, and every day thereafter "as long as the order of this Court is violated." The Court of Appeals affirmed both the original decree of the District Court and its subsequent contempt order,[7] and we granted certiorari to consider the questions presented by these two judgments.[8]

Much of the argument in the Court of Appeals and in this Court has centered upon the District Court's power to issue the order of September 15, 1965.[9] The union maintains that the order was an injunction against work stoppages and points out that in *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195, we held that, because of the Norris-LaGuardia Act, a federal court cannot enjoin a work stoppage even when the applicable collective bargaining agreement contains a no-strike clause. The association, on the other hand, argues that the order no more than enforced an arbitrator's award, and points out that in *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448, we held that, under § 301 of the Labor Management Relations Act, a federal court may grant equitable relief to enforce an agreement to arbitrate. The parties have strenuously argued the applicability of *Sinclair* and *Lincoln Mills* to the facts before us. We do not, however, reach the underlying questions of federal labor law these arguments present. For whatever power the District Court might have possessed under the circumstances disclosed by this record, the conclusion is inescapable that the decree which the court in fact entered was too vague

---

[7] 365 F. 2d 295, 368 F. 2d 932.

[8] 386 U. S. 907, 387 U. S. 916.

[9] Other issues have been argued as well. In light of our disposition of these cases, we do not reach them.

74

to be sustained as a valid exercise of federal judicial authority.

On its face, the decree appears merely to enforce an arbitrator's award. But that award contains only an abstract conclusion of law, not an operative command capable of "enforcement." When counsel for the union noted this difficulty and sought to ascertain the District Court's meaning, he received no response. Even at the contempt hearing on March 1, the union was not told how it had failed to "comply with and . . . abide by the [Arbitrator's] Award," in accordance with the District Court's original order. That court did express the view on March 1 that the February walkouts had been "illegal . . . under the circumstances." But such strikes would have been "illegal"—in the sense that they would have been violative of the collective bargaining agreement—even if the District Court had entered no order at all, *Teamsters Local* v. *Lucas Flour Co.*, 369 U. S. 95, and the record does not reveal what further "circumstances" the court deemed relevant to the conclusion that the union had violated its decree. Thus the September 15 decree, even when illuminated by subsequent events, left entirely unclear what it demanded.

Rule 65 (d) of the Federal Rules of Civil Procedure was designed to prevent precisely the sort of confusion with which this District Court clouded its command. That rule provides:

> "Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in

active concert or participation with them who receive actual notice of the order by personal service or otherwise."

Whether or not the District Court's order was an "injunction" within the meaning of the Norris-LaGuardia Act, it was an equitable decree compelling obedience under the threat of contempt and was therefore an "order granting an injunction" within the meaning of Rule 65 (d). Viewing the decree as "specifically enforcing" the arbitrator's award would not alter this conclusion. We have previously employed the term "mandatory injunction" to describe an order compelling parties to abide by an agreement to arbitrate,[10] and there is no reason to suppose that Rule 65 (d) employed the injunction concept more narrowly. That rule is the successor of § 19 of the Clayton Act.[11] Section 19 was intended to be "of general application," to the end that "[d]efendants . . . never be left to guess at what they are forbidden to do . . . ."[12] Consistent with the spirit and purpose of its statutory predecessor, we have applied Rule 65 (d) in reviewing a judgment enforcing an order of the National Labor Relations Board,[13] and the courts of appeals have applied the rule not only to prohibitory injunctions but to enforcement orders and affirmative decrees as well.[14] We have no doubt, therefore, that the

---

[10] *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448, upheld federal judicial power to issue such an enforcement order. In *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195, we described "the equitable relief granted in" *Lincoln Mills* as "a mandatory injunction to carry out an agreement to arbitrate." *Id.,* at 212.

[11] 38 Stat. 738, 28 U. S. C. § 383 (1940 ed.).

[12] H. R. Rep. No. 627, 63d Cong., 2d Sess., 26 (1914); S. Rep. No. 698, 63d Cong., 2d Sess., 21 (1914).

[13] *Regal Knitwear Co.* v. *Board,* 324 U. S. 9, 13–15.

[14] See, *e. g., International Brotherhood* v. *Keystone F. Lines,* 123 F. 2d 326, 330 (C. A. 10th Cir.); *NLRB* v. *Birdsall-Stockdale Motor Co.,* 208 F. 2d 234, 236–237 (C. A. 10th Cir.); *English* v. *Cun-*

District Court's decree, however it might be characterized for other purposes, was an "order granting an injunction" for purposes of Rule 65 (d).

The order in this case clearly failed to comply with that rule, for it did not state in "specific . . . terms" the acts that it required or prohibited. The Court of Appeals viewed this error as "minor and in no way decisional." [15] We consider it both serious and decisive.

The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid. Because the decree of this District Court was not so framed, it cannot stand. And with it must fall the District Court's decision holding the union in contempt. We do not deal here with a violation of a court order by one who fully understands its meaning but chooses to ignore its mandate. We deal instead with acts alleged to violate a decree that can only be described as unintelligible. The most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension.

*Reversed.*

MR. JUSTICE BRENNAN, concurring in result.

I concur in the result. But, like my Brother DOUGLAS, I emphasize that today's disposition in no way implies that *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195,

---

*ningham,* 106 U. S. App. D. C. 70, 77–78, 269 F. 2d 517, 524–525. Cf. *Brumby Metals, Inc.* v. *Bargen,* 275 F. 2d 46, 48–50 (C. A. 7th Cir.); *Miami Beach Federal Savings & Loan Assn.* v. *Callander,* 256 F. 2d 410, 415 (C. A. 5th Cir.).

[15] 365 F. 2d 295, 301.

determines the applicability of the Norris-LaGuardia Act to an equitable decree carefully fashioned to enforce the award of an arbitrator authorized by the parties to make final and binding interpretations of the collective bargaining agreement.

MR. JUSTICE DOUGLAS, concurring in part and dissenting in part.

I would reverse in No. 78 and in No. 34 remand the case to the District Court for further proceedings.

If the order of the District Court is an "injunction" within the meaning of Rule 65 (d), then I fail to see why it is not an "injunction" within the meaning of the Norris-LaGuardia Act. Legal minds possess an inventive genius as great as that of those who work in the physical sciences. Perhaps a form of words could be worked out which would employ the science of semantics to distinguish the Norris-LaGuardia Act problem from the present one. I for one see no distinction; and since I feel strongly that *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195, caused a severe dislocation in the federal scheme of arbitration of labor disputes, I think we should not set our feet on a path that may well lead to the eventual reaffirmation of the principles of that case. My Brother STEWART expressly reserves the question whether the present order is an injunction prohibited by the Norris-LaGuardia Act. Despite this qualification, once we have held that the order constitutes an "injunction," the District Court on remand would likely consider *Sinclair,* which is not overruled, controlling and apply it to preclude the issuance of another order.

We held in *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448, that a failure to arbitrate was not part and parcel of the abuses against which the Norris-LaGuardia Act was aimed. We noted that Congress, in fashioning § 301 of the Labor Management Relations Act, was seek-

ing to encourage collective bargaining agreements in which the parties agree to refrain from unilateral disruptive action, such as a strike, with respect to disputes arbitrable by the agreement. Hence, if unions could break such agreements with impunity, the congressional purpose might well be frustrated. Although § 301 does not in terms address itself to the question of remedies, it commands the District Court to hold the parties to their contractual scheme for arbitration—the "favored process for settlement," as my Brother BRENNAN said in dissent in *Sinclair*, 370 U. S., at 216. I agree with his opinion that there must be an accommodation between the Norris-LaGuardia Act and all the other legislation on the books dealing with labor relations. We have had such an accommodation in the case of railroad disputes. See *Brotherhood of Railroad Trainmen v. Chicago R. & I. R. Co.*, 353 U. S. 30. With respect to § 301, "Accommodation requires only that the anti-injunction policy of Norris-LaGuardia not intrude into areas, not vital to its ends, where injunctive relief is vital to a purpose of § 301; it does not require unconditional surrender." 370 U. S., at 225.

It would be possible, of course, to distinguish *Sinclair* from the instant cases. In these cases, the relief sought was a mandate against repetition of strikes over causes covered by the arbitrator's award. The complaint below alleged that the union's "refusal to comply with the terms of the Arbitrator's Award constitutes a breach of the applicable provisions of the current Collective Bargaining Agreement . . . ." Respondent asked that the court "enter an order enforcing the Arbitrator's Award, and that plaintiff may have such other and further relief as may be justified." We do not review here, as in *Sinclair*, a refusal to enter an order prohibiting unilateral disruptive action on the part of a union before that union has submitted its grievances to the arbitration procedure

provided by the collective bargaining agreement. Rather, the union in fact submitted to the arbitration procedure established by the collective bargaining agreement but, if the allegations are believed, totally frustrated the process by refusing to abide by the arbitrator's decision. Such a "heads I win, tails you lose," attitude plays fast and loose with the desire of Congress to encourage the peaceful and orderly settlement of labor disputes.

The union, of course, may have acted in good faith, for the new dispute may have been factually different from the one which precipitated the award. Whether or not it was, we do not know. To make the accommodation which the *Textile Workers* case visualizes as necessary between the policy of encouraging arbitration on the one hand and the Norris-LaGuardia restrictions on the other, the basic case must go back for further and more precise findings and the contempt case must obviously be reversed. See *Sinclair*, 370 U. S., at 228–229 (dissenting opinion).