**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jim S. BARNETTE, Defendant-Appellant.**

**James H. HOGUE, Acting Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,**

v.

**TROY MOTORS, INC., a corporation, et al., Defendants,**

**Jim S. Barnette, Defendant-Appellant.**

**Nos. 76–1890, 76–2222.**

United States Court of Appeals, Fifth Circuit.

Jan. 31, 1977.

Rehearing Denied March 25, 1977. See 549 F.2d 398.

Al J. Sansone, Montgomery, Ala., for defendant-appellant.

Ira DeMent, U. S. Atty., Kenneth E. Vines, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee in No. 76–1890.

Norman H. Winston, Assoc., Reg. Solicitor, U. S. Dept. of Labor, Birmingham, Ala., William J. Kilberg, Sol. of Labor, Carin Ann Clauss, Jacob I. Karro, Ovida C. Prevost, Sandy McCormack, Atty., U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellee in No. 76–2222.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

These are appeals from conviction of appellant, Barnette, of civil and criminal contempt in a case arising from a consent order enjoining violation by him and his Troy Motors, Inc., a corporation, of the terms of the wage and hour laws. The specific charge of which appellant was found guilty is that after the corporation had made payments to some 20 employees under the consent order [1] Barnette "wilfully violated the prohibitions of the judgment by coercing many of the employees to whom back wages were found due by the court to make partial kickback of back wages previously paid by defendants to said employees pursuant to the said court order."

The trial court dismissed both civil and criminal complaints against the corporation. There can be no doubt about the sufficiency of the evidence to sustain the court's determination that Barnette was guilty of civil contempt as will be demonstrated by the discussion hereafter with respect to the criminal case. We also conclude that under the standard that the Government must prove guilt of criminal contempt beyond a reasonable doubt, *United States of America v. Alek Fidanian,* 465 F.2d 755 (5th Cir. 1972), Barnette's conviction in the criminal contempt case must also be affirmed.

1. The consent decree enjoined Troy Motors, Inc. and its principal official and shareholder, Jim S. Barnette, from violating the minimum wage and overtime compensation provisions of the Act, 29 U.S.C. § 201 *et seq.,* and ordered them to pay $7,759.54 to the secretary for distribution to employees as back wages due them.

It is undisputed that five of the employees of Troy Motors, Inc., a corporation wholly-owned by Barnette, received payments from the Secretary of Labor resulting from the consent decree which ordered the company to make payments as back wages due to 20 of its employees in the total amount of $7,759.54 and that of that amount five of the employees had refunded to Barnette the sum of $1,783.72. Appellant bases his claim of the lack of sufficient evidence to permit a finding of guilt primarily on the fact that each of the five persons gave testimony at the trial which, if totally believed by the trial court, would have supported a finding that all of the "kickbacks" were voluntary. On the other hand, it is equally clear that testimony given by at least four out of the five, and possibly the fifth as well, would support a finding that there was some element of coercion or threat as the motivating factor which resulted in these employees paying back, generally, about two-thirds of the amount each of them received for unpaid wages under the consent decree. We need not consider whether even a totally voluntary repayment by these employees and its acceptance by Barnette would have been sufficient to sustain a criminal charge. It certainly would have been sufficient to sustain the charge of civil contempt under the long line of cases which hold uniformly that employees cannot, by their consent exculpate their employer, from complying strictly with the requirements of the wage and hour laws, *Brooklyn Bank v. O'Neil,* 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) *and see Mayhew's Super Liquor Stores, Inc. v. Hodgson,* 464 F.2d 1196 (5th Cir. 1972), where in footnote 1, page 1197, this Court said:

> " 'The legislative history of the Fair Labor Standards Act shows an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce. The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce. To accomplish this purpose standards of minimum wages and maximum hours were provided. Neither petitioner nor respondent suggests that the right to the basic statutory minimum wage could be waived by any employee subject to the Act. No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act.' 324 U.S. at 706–707, 65 S.Ct. at 902. Following *Brooklyn Bank,* a number of cases have held that contractual understandings which have the effect of 'circumventing or invading the command of the Wage and Hour Act' are invalid and unenforceable. *Mitchell v. Turner,* 286 F.2d 104 (5th Cir. 1960); *Wood v. Meier,* 218 F.2d 419, 420 (5th Cir. 1955); *Handler v. Thrasher,* 191 F.2d 120, 123 (10th Cir. 1951); *Mitchell v. Greinetz,* 235 F.2d 621, 625 (10th Cir. 1956); *Caserta v. Home Lines Agency, Inc.,* 273 F.2d 943, 946 (2nd Cir. 1959)."

But here there was much more for the trial court to base its decision on. The trial court, resolving all questions of credibility, which necessarily played a substantial part in the trial because of the relationship of employer and employee, could have found the following facts with respect to the five employees and the amounts they paid to Barnette out of the refunds they received for unpaid back wages.

I. LUCY GAYLORD: Mrs. Gaylord was a bookkeeper. She worked under Don Hutson, the office manager, whose wife Lynn Hutson, was the head bookkeeper. Before receiving her back paycheck from the Labor Department, Mrs. Gaylord was approached by the lawyer for defendants, Barron, who asked her whether she intended to return the money to Barnette. She replied that she probably would but was undecided. She was also asked by the head bookkeeper, Mrs. Hutson, the wife of her boss, whether

she had yet received the check and whether she was going to return it. To this she answered "yes." When she received her check, she kept it for a few days to see what the others were going to do; she finally told Barnette she wanted to return the check to him. She said: "I went to Mr. Barnette and told him that I had my check and wanted to give it back to him and asked him how to give it back to him, *and he told me just to have a steak dinner and give him the balance.*" [Emphasis added.] The record discloses that Gaylord's steak dinner cost her only $8.28, because she refunded $31.72. In response to a question on cross-examination as to whether Barnette asked her "to give that money back to him or to Troy Motors" she answered: "No, sir, not directly."

Following the cross-examination, the following testimony was given:

"THE COURT: You testified that you were not coerced directly?

WITNESS: Yes, sir.

THE COURT: The implications of that statement to me is that you may have been coerced indirectly.

WITNESS: Well, nobody ever really—

THE COURT: Will you explain to me what you meant when you said, 'Not directly'?

WITNESS: Well, nobody ever really told me that I would lose my job if I didn't give the money back; but, I mean, it was just—you know, everybody was kind of afraid, I guess you could say that, what might happen if they didn't. Nobody really had any concrete evidence that it would, I don't think."

At the time of the consent decree, she had been working for $75.00 a week on a 44 hour week schedule.

II. WILLIAM HEAD: As was the case with other employees, Head was interviewed by defendant's counsel, Barron, who told him that the company was going to have to pay back wages and asked whether he thought he had been underpaid. Head replied that he had not; he was later told by Barnette personally that he would be receiving a check and "he would like to have some of it back, if possible." Head received a check for $589. After paying some of the amount out of his checking account to pay bills with, he gave Barnette $100 in cash and had $75 deducted subsequently from his regular paycheck, which was entered on the company's books as charges for advances. In response to the question whether Head had any conversation with Mr. Barnette about how much of the $589 he "could" keep, Head testified: "We agreed that *he would give us* a third of it; yes, sir, and we give him the other back." Head fared better than the other employees, because he had spent more of his refund and had only $100 cash left to refund to Barnette and these proceedings ensued before the remaining total of $250 could be deducted from his wages. Head was the company's service manager and had charge of all employees in the shop area, including at least some of the other three employees. He held a meeting in his office where he discussed with the others the idea of returning their back pay, explaining that the company was in trouble and that they might lose their jobs, although he testified he was not told by Barnette to say this.

III. DARREL CORLEY: Corley, with an eighth grade education, greased cars and handled lubrication and oil changes in the service department. He received a check for $716. He gave back "two or three hundred" and said he still "owe[d] him some more money." He identified a charge against his account of $177 as to which Barnette had told him that if anybody asked him that "this $177 was for money he loaned [him] to pay doctor's bills." He testified that no such loan had been made and he had not had any doctor's bills paid by the company. Assuming the cash payment to have been $300, this when added to the $177 would equal almost precisely two-thirds of the refund check for $716 that he received. After repeated direct and cross-examination, his testimony finally arrived at the following exchange:

"Q. [By Government counsel] You say that Mr. Barnette said if you were

ever asked, to tell him that was for doctor bills—

A. (Nodded to indicate affirmative reply).

Q. —after your wife had a baby?

A. Right.

Q. Who arrived at the figure of a hundred and seventy-seven dollars, Mr. Barnette or you?

A. I don't know; I don't know nothing about that hundred and seventy-seven dollars, tell you the truth.

Q. You just know you didn't get it?

A. Right.

Q. All right, sir. Do you know that that—that money was withheld from that—from your pay check to make up this hundred and seventy-seven dollars?

A. (Nodded to indicate affirmative reply)

Q. You do know that?

A. Right."

The computations made a part of the order of refund in the civil case show that the total amount paid by Corley to Barnette and deducted by the company from his subsequent paychecks equal $477, within pennies of two-thirds of the amount of his refund check of $716.

IV. JIMMY GOLDEN: The first suggestion to Golden with respect to paying back part of his check from the Government came from the company's counsel, Barron, who got him also to concede that he had been paid everything he thought was owed him and told him the company was involved in a lawsuit pertaining to overtime and minimum wage and further that he had asked Golden if he was expecting any additional money back. He asked what Golden was going to do with the money if he got some from the Government. Golden replied: "I said I would give it back." Upon receiving his check, Golden deposited it in the bank, where it remained for about three weeks. In response to the question: "What did you do with it," he answered, "I paid it back to the company, *what percentage of it*

*they asked for back.*" The testimony then continued:

"Q. Who asked for the percentage back?

A. Well, didn't nobody ask for it; he just said we could give it back if we wanted to.

Q. How much did you give back?

A. $600.

Q. How much did you pay—was all of it in cash?

A. No, sir. $550.

Q. And who did you pay that to?

A. I give it to Mr. Barnette.

Q. What about the other $50?

A. I told him to put it—take it out on my account, put it on my account.

Q. And did he do that?

A. Yes, sir."

Subsequently the following testimony was received:

"Q. [By Government counsel]. Do you recall, after you received your check, having any meetings with Ronnie Head, with Darrel Corely, and with Raymond Crews and Mr. Barnette?

A. Well, only one.

Q. When did that meeting take place?

A. I don't remember what day.

Q. Well, about when; was it after these checks were received?

A. Yes, sir; I think it was.

Q. Was it before you paid Mr. Barnette the five hundred and fifty dollars?

A. Yes, sir.

Q. What was said at that meeting?

A. Well, he just said we could give it back if we wanted to or we could keep it if we wanted to.

THE COURT: He, who?

WITNESS: Mr. Barnette.

Q. How did you arrive at the six hundred dollars that you were going to pay him back?

A. Well, he said we could keep some, we could give some of it back, or whatever.

Q. Well, what was the factor that made you decide to keep approxi-

mately two—one-third and give back two-thirds?

A. Well, I reckon Ronnie Head or somebody said we could give back a third and keep—give two-thirds back and keep a third."

Barnette asked Golden twice whether he had gotten his check from the Government. On the first occasion, Golden had not received it and told Barnette so. On the second occasion, he had received it, but again told Barnette that he had not. This was when Head, the service manager, had his meeting at which "we decided what we were to give" and further, "Mr. Head told me not to tell him we had got our checks, because—because he was our boss man, and I had to do what he said, too."

V. RAYMOND CREWS: The final employee witness was Raymond Crews, a laborer in the clean-up department. He received a refund check of $798, which he said he kept about three weeks. He said he did not recall the meeting in Head's office which others testified he attended. He handed Barnette a $500 bill which he decided to pay back because "I had it home; I didn't want to keep saving it, so I went ahead and took it up there to him" and also, because "well, he had always paid me what he say he was going to pay me a week, so I decided to give it to him." He then referred to the meeting which previously he had not remembered and spoke of it in the following terms: "Well, when Ronnie Head and Golden was up there talking in the shop that we going to give it back, that is the only time anybody was talking about it." This is the session as to which Head testified: "We agreed that he would give us a third of it; yes, sir, and we give him the other back." Two-thirds of Crews' refund would have been $532.

Of course, as already indicated, each of the witnesses undertook to testify that he or she did not feel under coercion or threat upon making the decision to give back what in each case amounted to almost precisely two-thirds of the amount of the refund received by each. However, with the exception of Raymond Crews, each of the witnesses included testimony inconsistent with this conclusion. Recognizing that they were all still employed by the company owned by Barnette, the court could well have concluded that the exculpatory statements were made in an effort by the several witnesses to put as favorable a picture on their relationship with their employer as possible. There is no doubt that the initial suggestion of repayments to the company came through the intervention of the company's lawyer and/or supervising employees. It was also perfectly clear that an agreement of some sort was entered into with respect to the percentage of the salary payments that were to be repaid to Barnette. The trial court was wholly justified in determining that such agreement was one which the employees could not safely decline to accept when hammered out in the service manager's office in the presence of Barnette.

With respect to the requirement that Barnette's conduct was shown to be willful, it is clear that the undisputed evidence that he had caused the books of the company to contain false entries and that he had instructed the employees to give a false report if questioned about the charges which were made against them in order to obtain his full two-thirds, were more than sufficient to establish a willful purpose to violate the court's order. This Court has said in *United States v. Fidanian, supra:*

"To sustain a finding of willfulness the government need not prove evil motive on the part of the defendant. It is sufficient if the defendant's actions were deliberate, voluntary, or intentional, as distinguished from accidental, inadvertent, or negligent." Citing cases 465 F.2d at 760.

The court there pointed to the fact that three of the employers' workers, including his bookkeeper, testified that he had directed the falsification of employee time and wage records. Here, too, there is undisputed evidence that Barnette had directed that false records be maintained for the purpose of covering up the receipt by him of the amounts that were not paid to him in cash.

■ The United States, by commendable candor, during oral argument conceded that the trial court had given Barnette a sentence beyond that authorized for the punishment of criminal contempt. U.S.Code Title 18, § 401 provides:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as . . .

(3) Disobedience or resistence to its lawful writ, process, order, rule, decree, or command."

It will be noted that this language provides for punishment in the alternative for fine or imprisonment. The section does not include the language contained in other criminal statutes "or both." The language of the statute seems clearly to require the result announced by the Supreme Court as to an earlier statute in *In Re William V. Bradley,* 318 U.S. 50, 63 S.Ct. 470, 87 L.Ed. 500 (1943). The Court there said with respect to a sentence arising from the enforcement of a labor board decision:

"Under § 268 of the Judicial Code, 28 U.S.C. § 385, (the predecessor section) the sentence could only be a fine *or* imprisonment." [Emphasis in original.] Citing *Ex Parte Robinson,* 19 Wall. 505, 512, 22 L.Ed. 205; *Clark v. United States,* 8 Cir., 61 F.2d 695, 709; *affirmed* 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993.

The judgment of guilty and the civil penalty in the civil case is affirmed.

The judgment of guilty of criminal contempt is affirmed.

That part of the judgment in the criminal contempt case prescribing 30 days' custody and a fine of the sum of $1,000 must be vacated. The case is remanded to the trial court for a revision of the sentence within the terms allowed by the statute.

AFFIRMED in part and REMANDED in part.

RONEY, Circuit Judge, concurring in part and dissenting in part:

Although I concur in the decision that Barnette's civil contempt should be upheld, I respectfully dissent from the affirmance of his criminal contempt conviction.

The defendant technically complied with the district court's order, but ran afoul of its purpose in receiving back from various employees part of the money paid to them. Citation for civil contempt, with an opportunity to purge one's self, is little more than a method of enforcement. *Lewis v. S. S. Baune,* 534 F.2d 1115 (5th Cir. 1976); *Norman Bridge Drug Co. v. Banner,* 529 F.2d 822 (5th Cir. 1976). Only action and not specific intent or willfulness need be shown to trigger the civil contempt enforcement procedure to obtain compliance with the decree. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949). Criminal contempt is entirely different. The court order becomes a criminal statute and the conduct required for conviction requires willfulness and intent to violate the order. *In re Joyce,* 506 F.2d 373 (5th Cir. 1975).

While the order was clear in requiring the defendant to pay back wages, it is not clear in declaring that receiving funds back from the employees would constitute prohibited conduct. When this uncertainty is combined with the equivocal testimony which each witness gave on the stand, it does not seem to me that a trier of fact could find beyond all reasonable doubt that Barnette had willfully engaged in conduct that he could reasonably know was criminally prohibited. A court order, like a criminal statute, must be certain enough so that a person can know precisely the conduct which could land him in jail. *Longshoremen v. Marine Trade Assn.,* 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967). I do not think that situation existed in this jail-term criminal conviction.