RICHARD DOE, a Minor, by his Parents and Next Friends, John Doe, *et al.*, Plaintiffs-Appellants, v. ROBERT J. LUTZ *et al.*, Defendants-Appellees.

First District (2nd Division) No. 1—92—2003

Opinion filed September 7, 1993.

Thomas D. Decker & Associates, Ltd., of Chicago (Thomas D. Decker, of counsel), for appellants.

Mayer, Brown & Platt (Bettina Getz and Lucia Nale, of counsel), Sidley & Austin (Mary Dempsey and Susan Stone, of counsel), and Patricia C. Bobb & Associates (Patricia C. Bobb, of counsel), all of Chicago, for appellees.

JUSTICE DiVITO delivered the opinion of the court:

"John Doe" (Doe) appeals from an order finding him in civil contempt for violating a circuit court order prohibiting him from having contact with an individual named David Nolan. Doe contends that (1) the court's order prohibiting contact with Nolan was not in effect

when the contact took place; (2) the order was not sufficiently clear to support a contempt finding; (3) the court erred in holding that the order prohibited contact between him and Nolan regardless of who initiated the contact; and (4) his due process rights were violated by the indefinite lifespan of the order.

In 1989, plaintiffs "John and Jane Doe" filed an action alleging that their son, "Richard Doe," while enrolled at a school run by the Catholic Bishop of Chicago (the Catholic Bishop), was sexually abused by Robert Lutz, the church pastor, and Alice Halpin, the school principal (jointly defendants). Plaintiffs hired Richard O'Brien, a private investigator, to gather evidence to support their allegations. David Nolan told O'Brien that he had been sexually abused by Halpin and a priest referred to as "Father Jackson" when he was enrolled at another school run by the Catholic Bishop. On October 1, 1990, O'Brien and Doe, a licensed attorney, conducted a tape-recorded interview of Nolan, and also took his sworn statement. In both, Nolan repeated his allegations of sexual abuse.

Plaintiffs produced the transcript of Nolan's sworn statement as well as the two cassette tapes of the interview for the Catholic Bishop, which began an internal investigation into the allegations. During this investigation, Nolan made a second sworn statement on October 26, 1990, wherein he recanted the statements he made to O'Brien and Doe, and alleged that O'Brien had offered him $10,000 to make false allegations and coached him in making the allegations. Nolan explained that O'Brien told him that Doe was going to replace him unless he found some corroborating evidence, and therefore offered the money in order "to help [Doe] win [his] suit against the Archdiocese." He also stated that after Father Jackson called him to determine why he had made the accusations, he called Doe and complained that their "agreement" did not include making public "the stuff *** that [Doe] had [him] say about Father Jackson."

On November 30, 1990, Nolan contacted the Catholic Bishop's counsel and said that O'Brien had been attempting to contact him. In a sworn statement taken that day, Nolan stated that he felt "threatened" by O'Brien's efforts to "harass" and "track [him] down." Three days later, on December 3, 1990, defendants filed a motion in the circuit court seeking an order requiring plaintiffs "to cease harassing third party witnesses." Defendants also sought a prohibition on "plaintiffs and/or their agents from interviewing defendant's personnel *** unless such interviews are conducted through formal discovery." At the hearing on the motion which was held on December 6, 1990, plaintiffs asserted that they were unaware of any attempted

contact of Nolan by O'Brien, and stated that prior to the filing of the motion, they had no motive to harass Nolan because they assumed he was a cooperative witness. The court then ordered that a second hearing be held after plaintiffs had an opportunity to respond to the allegations. The court also ordered that

"plaintiffs and their agents, including Richard O'Brien, are prohibited from contacting David Nolan until after disposition of the motion."

Following the hearing, plaintiffs filed a response asserting that scientific testing of the cassette tapes demonstrated that there was no opportunity for O'Brien to coach Nolan. Plaintiffs therefore moved for sanctions against defendants for bringing Nolan's allegations to the court's attention.

At the hearing on January 8, 1991, the court informed the parties that it had referred Nolan's allegations to the State's Attorney for investigation. The court then asked the parties to "wait until the State's Attorney's Office has made its investigation [in order] to determine whether or not any further proceedings relative to Nolan or O'Brien" were necessary. None of the parties objected to the stay. An order entered on January 11, 1991, provided in pertinent part:

"1. The parties' respective motions for sanctions are stayed pending investigation by the Cook County State's Attorney's Office regarding the facts alleged, and the allegations made, by witnesses and others in connection with defendant's motion and plaintiffs' response thereto."

No other mention of the Nolan matter was made in the order.

On July 11, 1991, the State's Attorney informed the court that it was "declining criminal prosecution at [that] time." No further action on the matter was taken by the court.

On September 19, 1991, at about 9:45 a.m., Nolan called Doe at his office and left a message with his secretary that Doe would know what he was calling about, and that it was "important" that Doe return the call. When Doe received the message, he assumed that it involved Nolan's earlier claims of sexual abuse, but believed that the court's December 6, 1990, order prohibited him from returning the call. Doe testified that he believed that, as an attorney and an officer of the court, he had a duty to determine the nature of the call because it might have involved the commission of a felony. He therefore instructed his secretary to return the call in order to determine what Nolan wanted. Doe testified that he believed that such action did not violate the court's order, which was intended to protect Nolan from

harassment, for his secretary was merely a "non-threatening interme-diary." The secretary was unable to reach Nolan, however.

Later that afternoon, Doe explained to William Callaghan, a friend and private investigator, that he was precluded by court order from returning Nolan's call, so he asked him to call Nolan to deter-mine what he wanted. Callaghan then called and spoke to Nolan over a speaker phone while Doe was in the room. Callaghan told Nolan that Doe was in the room, but that he was unable to speak to him due to a court order. Doe admitted, however, that he spoke to Nolan over the speaker phone. Nolan told them that he had called because he had new information that Father Jackson was sexually abusing children, but he was afraid to go to the police because they would not believe him since he had recanted his previous statement that he had been molested by Jackson. Doe and Callaghan then offered to pick him up and take him to the police station.

Doe, Callaghan, and another investigator, Ernie Sinks, met Nolan at his apartment and spent approximately half an hour driving to sev-eral police stations so Nolan could file a complaint. During that time, Doe and Nolan discussed the accusation that O'Brien offered him money to make false allegations against Alice Halpin.

The next day, Doe prepared for his secretary an affidavit which stated that she received a call from Nolan on the morning of Septem-ber 19, 1991. Doe explained that he prepared the affidavit because he was "concern[ed] that something would arise based upon the contact with Nolan." Doe also sent a letter to Callaghan which stated that he and his agents were prohibited from contacting Nolan, but "[n]otwith-standing the above, I want to thank both you and Investigator Ernie Rinks [sic] *** for assisting David Nolan in making his report. *** I must and will, however, refrain from any further contact with Mr. Nolan." Doe explained that he wrote this letter in order to establish that Callaghan and Sinks were not his agents.

On November 20, 1991, alleging that Doe violated the court's or-der prohibiting contact with Nolan, defendants filed a petition for a rule to show cause for civil contempt, a petition for adjudication of criminal contempt, and a motion for sanctions under Supreme Court Rule 219 (134 Ill. 2d R. 219). The court issued a rule to show cause and, on February 20, 1992, following an evidentiary hearing, found Doe in civil contempt of court for having "knowingly and wilfully vio-lated the December 6, 1990 order." The court also ruled that the pro-tective order remained in "full force and effect" and ordered Doe to pay $500 in costs to the circuit court. This appeal followed.

Initially, we note that Doe was found in civil rather than criminal contempt. Our law is well settled that contempt is characterized as civil if the sanctions are intended to coerce the contemnor to perform a particular act (see *In re Marriage of Logston* (1984), 103 Ill. 2d 266, 289, 469 N.E.2d 167 (noting that in civil contempt, the contemnor is able to "purge himself of contempt" by complying with the mandate of the court)), and criminal if the sanctions are imposed for the purpose of punishing past misconduct. (*In re Marriage of Wilde* (1986), 141 Ill. App. 3d 464, 469, 490 N.E.2d 95.) Although the circuit court did not make clear its purpose in imposing $500 in costs, defendants cite *Ritter v. Rush-Presbyterian-St. Luke's Medical Center* (1988), 177 Ill. App. 3d 313, 322, 532 N.E.2d 327, for the proposition that a contempt finding for a violation of a discovery order may be classified as civil rather than criminal. In any event, Doe raises no issue concerning the characterization of the contempt and, when asked during oral argument, counsel specifically stated that civil contempt was proper in this case. We therefore decline any review of this issue.

■■ Doe's first contention is that the circuit court improperly found him in contempt for violating the protective order because it was temporary and had expired before the events in question occurred. He asserts that the language of the order demonstrates that it was intended to be only a temporary prohibition, and because it "expired by its own terms *** such matters are accordingly moot." (See *In re M.C.* (1980), 89 Ill. App. 3d 1130, 1131, 412 N.E.2d 709.) He maintains that the January 11, 1991, order disposed of the earlier motion for a protective order or, he argues in the alternative, that the protective order expired on July 11, 1991, when the State's Attorney sent the letter to the court informing it that no criminal prosecution would be undertaken.

In determining whether there has been a violation of a court order, the order must be construed with reference to the context in which it was issued and the purpose for which it was requested. (*Dolnick v. General Superintendent of Schools* (1978), 67 Ill. App. 3d 8, 13, 384 N.E.2d 408.) Here, the protective order was issued in the context of allegations of illegal conduct. The circuit court granted immediate but temporary relief and allowed plaintiffs to respond to the allegations. After reviewing Doe's response, the court determined that the most prudent course was to stay the motions and refer the case to the State's Attorney for investigation. Thus, the January 11, 1991, order, staying motions for sanctions and referring the matter to the State's Attorney, did not dispose of the Nolan matter. Instead, the

court plainly intended to continue the pendency of the motions rather than resolve any issue at that time.

Similarly, the State's Attorney's decision to decline criminal prosecution had no effect on the pendency of the motions. Because the authority to issue a stay order is an inherent attribute of a court's power to control the disposition of a case before it (*In re Estate of Lanterman* (1984), 122 Ill. App. 3d 982, 990, 462 N.E.2d 46), it follows that only a court can withdraw a stay and rule on a pending motion. The circuit court was therefore correct in ruling that the prohibition against contact remained in "full force and effect" through September 1991.

■ Doe next contends that the December 6, 1990, order was not sufficiently clear to serve as a basis for a contempt citation. He asserts that "at best, it is uncertain when the *** order was to expire." Defendants respond that based on the context within which the order was issued, the order was sufficiently clear to apprise Doe that it was still in effect in September 1991.

Under Illinois law, a "mandate of the court must be clear before disobedience can subject a person to punishment" (*People v. Wilcox* (1955), 5 Ill. 2d 222, 228, 125 N.E.2d 453), and the "most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension." (*International Longshoreman's Association, Local 1291 v. Philadelphia Marine Trade Association* (1967), 389 U.S. 64, 76, 19 L. Ed. 2d 236, 245, 88 S. Ct. 201, 208.) However, no such difficulties exist when a court holds in contempt a party "who fully understands [the court's] meaning but chooses to ignore its mandate." *International Longshoreman's Association*, 389 U.S. at 76, 19 L. Ed. 2d at 245, 88 S. Ct. at 208.

In the instant case, overwhelming evidence exists that Doe knew the order remained in effect on September 19, 1991, but chose to ignore its mandate. Aside from Callaghan's testimony and his own secretary's affidavit, Doe's own actions and statements demonstrate that he understood the order remained in effect. Therefore, it cannot be said that the order was so uncertain as to make it incomprehensible.

■ Doe also contends that the plain language of the protective order and the context in which it was issued indicate that he was prohibited only from initiating contact with Nolan and was free to respond to inquiries initiated by him. Defendants assert that the order prohibited all contact between Doe and Nolan, regardless of who initiated it.

Protective orders are orders of the court, not of the person to whom they extend protection. (*People v. Townsend* (1989), 183 Ill. App. 3d 268, 271, 538 N.E.2d 1297 (holding that a victim's invitation to violate the court order is irrelevant to a contemnor's conviction for willful misconduct).) Here, the court ordered that contact between Doe, or his agents, and Nolan was prohibited. Therefore, because Nolan could not waive that protection on his own, who initiated the contact is irrelevant to whether Doe acted in contempt of the circuit court's order. Furthermore, a commonsense interpretation of the court's order, as well as Doe's belief that the order prohibited him from returning Nolan's call, establishes that all contact between Doe or his agents and Nolan, regardless of who initiated it, was not allowed.

■■ Finally, Doe contends that his due process rights would be denied if the protection order is construed to have an indefinite lifespan. He asserts that before the imposition of such a permanent interference, he should have been notified of an intent to do so and he should have been given the opportunity to present evidence to challenge such an order.

Initially, we note that Doe has waived this issue by failing to raise it in the circuit court. (See *Pillot v. Allstate Insurance Co.* (1977), 48 Ill. App. 3d 1043, 1046, 363 N.E.2d 460 (holding that the plaintiff waived a constitutional question by failing to raise it in the circuit court).) Even if the issue was properly before us, however, his arguments would be unavailing because the record shows that Doe was notified of the court's proceedings and had an opportunity to be heard. Furthermore, at the time, he stated that he had "[n]o objection" to the court's imposition of the protective order. Therefore, there was no violation of Doe's due process rights in this case.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.