[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 95-9059

D. C. Docket No. 4:95-CV-36(JRE)

IN RE:  E.I. DuPONT DE NEMOURS & COMPANY-
        BENLATE LITIGATION.

THE BUSH RANCH, INC., WILLIAM R. LAWSON,
individually, YELLOW RIVER GROWERS, C. RAKER & SONS,
INC., a Michigan corporation,

                                        Petitioners-Counter-
                                                Defendants-
Appellees,

C. NEAL POPE, a Georgia resident, POPE, McGLAMRY,
KILPATRICK & MORRISON, a Georgia partnership,

Counter-Defendants,

                        versus

E.I. DuPONT DE NEMOURS & COMPANY, a
Delaware corporation,

                                Respondent-Counterclaimant,
                                        Appellant.

Appeal from the United States District Court
for the Middle District of Georgia

(October 17, 1996)

Before DUBINA, and CARNES, Circuit Judges, and FARRIS*, Senior
Circuit Judge.

DUBINA, Circuit Judge:

*Honorable Jerome Farris, Senior U.S. Circuit Judge for the Ninth
Circuit, sitting by designation

This case involves an appeal from a contempt order entered by the district court against the Defendant-Appellant E.I. Du Pont de Nemours & Company ("DuPont"). For the reasons that follow, we reverse the district court's order and remand the case for further proceedings.

## I. Background

This appeal has its origins in four consolidated cases, known collectively as the Bush Ranch litigation, that were tried before the district court in 1993. The primary issue at trial was whether Benlate 50 DF--a fungicide manufactured by DuPont and sold to the plaintiffs for use at their nurseries--was contaminated with highly toxic herbicides known as sulfonylureas ("SUs"). After the case was submitted to the jury, the plaintiffs in the Bush Ranch litigation offered to settle their claims, and DuPont agreed. Accordingly, on August 16, 1993, the plaintiffs in the Bush Ranch litigation voluntarily dismissed their claims with prejudice.

After the settlement, the plaintiffs in a Hawaii Benlate case requested documents related to testing of Benlate 50 DF from the Bush Ranch litigation. DuPont resisted, but it eventually produced the documents pursuant to a court order. Among the test documents produced in the Hawaii Benlate case were certain raw test data (the "Alta data") that DuPont had not produced during the course of the Bush Ranch litigation. The Alta data included analytical findings which some experts would construe as evidence that Benlate 50 DF was contaminated with SUs.

3

As a result of the production of the Alta data in the Hawaii Benlate case, the Appellees[1] returned to the district court--more than a year and a half after the settlement of the Bush Ranch litigation--with a petition seeking sanctions against DuPont. The Appellees charged that DuPont had intentionally withheld evidence of SU contamination which was in its possession and which the district court had ordered it to produce. Furthermore, the petition charged that DuPont had falsely represented to the district court and to the Appellees that the Alta data it withheld contained no evidence of SU contamination. In response to the petition, the district court set a hearing date and ordered DuPont to appear and show cause why it should not be sanctioned.

DuPont filed a motion to recuse under 28 U.S.C. §§ 144 and 455, a motion to vacate the show cause order, and a motion to dismiss the Appellees' petition. The district court denied each of these motions and also dismissed DuPont's counterclaims against the Appellees. Following the district court's denial of the motion to recuse, DuPont filed a motion to stay the proceedings to enable it to seek writs of prohibition and mandamus from this court. The district court denied the motion to stay the proceedings, and this court subsequently denied DuPont's emergency motion for a stay and its petitions for writs of prohibition and mandamus.

The show cause hearing began on May 2, 1995, and continued

---

[1] The Appellees are the plaintiffs from three of the four cases consolidated in the original Bush Ranch litigation. Specifically, the Appellees consist of The Bush Ranch, Inc., William R. Lawson, Yellow River Growers, Roy Phillip Barber, Carol H. Barber, and C. Raker & Sons, Inc.

through May 12, 1995. On the basis of the evidence presented at the hearing, the district court issued an order finding that DuPont's failure to produce the Alta data had violated its discovery orders in the Bush Ranch litigation. The district court specifically found that "DuPont deprived [the Appellees], the [district court], and the jury of data and documents highly relevant to the issue which DuPont itself described as the most critical issue in the case." In re E.I. du Pont de Nemours & Co., 918 F.Supp. 1524, 1556 (M.D. Ga. 1995). The district court also found that DuPont's conduct was "willful, deliberate, conscious, purposeful, deceitful, and in bad faith;" that this deceitful conduct "affected the rulings and the orders of [the district court] and interfered with the administration of justice;" and that this discovery abuse rendered the trial, which had lasted approximately six weeks, "a farce." Id.

Accordingly, the district court entered a sanctions order against DuPont consisting of the following four components:

(1) The district court directed DuPont to send copies of the sanctions order and the withheld documents to the Appellees and the rest of the plaintiffs in the Bush Ranch litigation.

(2) The district court found that the plaintiffs in the Bush Ranch litigation had together expended $6,843,837.53 in preparation for the trial and assessed a sanction in that amount against DuPont. The district court assessed another sanction for the same amount against DuPont to pay for the "wasted time, inconvenience, and waste of judicial resources inflicted upon [the district court] and the jury for the pretrial and trial of the consolidated cases." Id. at 1557. The district court ordered that the total sum--$13,687,675.06--be paid into the registry of the court.

5

(3)     The district court partially vacated the order entered upon settlement of the Bush Ranch litigation, thereby reinstating several orders finding discovery abuses by DuPont during the course of the trial.  The district court specifically reinstated a conditional $1 million sanction it had imposed upon DuPont during the trial.  The district court also assessed a sanction of $100 million against DuPont for its conduct during the previous litigation and during the show cause hearing.  The district court announced that it would permit DuPont to purge itself of the $1 million and $100 million sanctions by complying with all other sanctions orders and by publishing a full page advertisement in the Wall Street Journal and in the most widely circulated newspapers in Alabama, Georgia, and Michigan acknowledging its wrongdoing and giving notice of the district court's orders and sanctions.  The form of the advertisement was to be submitted to the district court for its approval.

(4)     The district court ordered DuPont to file, within 25 days, a certificate of compliance signed by DuPont's chief executive officer confirming that DuPont was in full compliance with the terms of the sanctions order.  The district court warned DuPont that it would impose additional sanctions of $30,000 a day for each day after the termination of the 25-day grace period during which DuPont had not both fully complied with the sanctions order and filed the requisite certificate of compliance.

DuPont requested a stay of the sanctions order to enable it to appeal to this court.  The district court granted the stay, and this appeal followed.

## II. Issues Presented

In its effort to defeat the contempt order, DuPont presents three issues which we must discuss in order to decide this appeal.[2] First, DuPont argues that the district court lacked jurisdiction to entertain the proceedings which culminated in the issuance of the

_____

[2]   We do not address the remaining issues raised by the parties, because our resolution of these first three issues is dispositive of this appeal.

contempt order.  Second, DuPont contends that the district court erred in imposing criminal contempt sanctions in a civil proceeding.[3]  Third, DuPont claims that its failure to produce the Alta data violated no order of the district court.

### III. Standards of Review

We review the district court's assertion of jurisdiction <u>de novo</u>.  <u>See</u> <u>Mutual Assurance, Inc. v. United States</u>, 56 F.3d 1353, 1355 (11th Cir. 1995).  We also review<u>de novo</u> the district court's characterization of these proceedings as civil, and not criminal, in nature.  <u>See</u> <u>International Union, United Mine Workers of America v. Bagwell</u>, ___ U.S. ___, ___, 114 S.Ct. 2552, 2561-63, 129 L.Ed.2d 642 (1994); <u>Martin v. Guillot</u>, 875 F.2d 839, 845 (11th Cir. 1989).  As will be discussed <u>infra</u>, DuPont's challenge to the existence of an order requiring production of the Alta data presents a question of evidence sufficiency which we review <u>de novo</u>.  <u>See</u> <u>United States v. Keller</u>, 916 F.2d 628, 632 (11th Cir. 1990), <u>cert. denied</u>, 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991).

### IV. Discussion

A.    <u>Jurisdiction.</u>

DuPont argues that the district court "lacked jurisdiction to

---

[3]    The district court invoked several sources of authority for imposing sanctions on DuPont.  <u>See</u> <u>In re E.I. du Pont de Nemours & Co.</u>, 918 F. Supp. at 1540-41.  However, we are persuaded that none of these sources of authority could support the sanctions order without the assistance of the district court's inherent contempt power--a fact that the Appellees themselves recognize.  <u>See</u> Appellees' Br. at 24 ("Having jurisdiction, <u>and because no single rule was up to the task</u>, the [district court] properly relied on its inherent powers to sanction DuPont.") (emphasis added). Thus, we need examine only the constitutionality of the district court's exercise of its inherent contempt power to determine whether the sanctions order can stand.

entertain an independent civil action for sanctions based on alleged misconduct in the long-dismissed Bush Ranch litigation." DuPont's Br. at 17. We disagree. Every district court "has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." Chambers v. NASCO, Inc., 501 U.S. 32, 44, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991) (citing Universal Oil Prods. Co. v. Root Ref. Co., 328 U.S. 575, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946)). In addition, the district court was free to vacate its earlier judgment, in whole or in part, and to resume proceedings on the same jurisdictional basis as it possessed in the underlying case. See Chambers, 501 U.S. at 44 ("Of particular relevance here, the inherent power also allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court.") (citing Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1994); Universal Oil, 328 U.S. at 580). For this reason, the Supreme Court has specifically held that "[a] court may make an adjudication of contempt and impose a contempt sanction even after the action in which the contempt arose has been terminated." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 396, 110 S.Ct. 2447, 2456, 110 L.Ed.2d 359 (1990) (citations omitted). Thus, we conclude that the district court possessed jurisdiction to conduct the challenged proceedings.

B.   Nature of the Sanctions.

DuPont contends that the district court committed reversible error in imposing criminal sanctions in a civil proceeding. It is

8

indisputable that the district court did not afford DuPont the procedural protections the Constitution requires for the imposition of criminal contempt sanctions.[4]  Thus, the proceedings were civil in nature, and DuPont's entitlement to relief on appeal turns on our characterization of the contempt order as being either civil or criminal in nature.  See Blalock v. United States, 844 F.2d 1546, 1560 n.20 (11th Cir. 1988) (per curiam) (Tjoflat, J., specially concurring) ("It requires no citation of authority to say that a district court may not, even unwittingly, employ a civil contempt proceeding to impose what, in law, amounts to a criminal contempt sanction. . . . When a district court employs civil contempt procedures to punish a contemner, it necessarily deprives the contemner of his constitutional rights and renders his contempt citation a nullity.").

The Supreme Court has instructed that "conclusions about the civil or criminal nature of a contempt sanction are properly drawn, not from the subjective intent of [the court imposing the

---

[4]  The Supreme Court summarized these requirements in the following passage:

> [T]his Court has found that defendants in criminal contempt proceedings must be presumed innocent, proved guilty beyond a reasonable doubt, and accorded the right to refuse to testify against themselves; must be advised of charges, have a reasonable opportunity to respond to them, and be permitted the assistance of counsel and the right to call witnesses; must be given a public trial before an unbiased judge; and must be afforded a jury trial for serious contempts.

Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 798-99, 107 S.Ct. 2124, 2133, 95 L.Ed.2d 740 (1987) (citing Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911); Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925); In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); and Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968)).

sanction], but from an examination of the character of the relief itself." International Union, United Mine Workers of America v. Bagwell, ___ U.S. ___, ___, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642 (1994) (citation and internal quotation marks omitted). If the relief is designed to compensate a complainant for losses or to coerce a party into complying with a court order, the contempt sanction is civil in nature. See id., 114 S.Ct. at 2558; Martin v. Guillot, 875 F.2d 839, 845 (11th Cir. 1989). By contrast, "if a court seeks to vindicate its authority by punishing a contemnor, then [the] contempt is criminal in nature." Martin, 875 F.2d at 845 (citations omitted). Thus, we must determine whether the specific sanctions ordered by the district court were compensatory and coercive in nature, or instead were punitive in nature.

We have little trouble concluding that the sanctions the district court imposed were overwhelmingly punitive--and thus criminal--in nature. First, there was no compensatory aspect to the contempt order. The only provision even arguably geared toward compensation of the parties was the first command that DuPont pay a sum of $6,843,837.53. Although the district court chose this figure because it represented the cost to the plaintiffs in preparing for and conducting the underlying trial, the district court did not order that this sum be paid to the Appellees or to any of the other plaintiffs in the original Bush Ranch litigation. Instead, the district court ordered the sum to be paid into the registry of the court. The Supreme Court has provided few "straightforward rules" for distinguishing between civil and

10

criminal contempts, Hicks ex rel. Feiock v. Feiock, 485 U.S. 624, 631-32, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988), but it has held that "[i]f the relief provided is a fine, it is remedial [and thus civil in nature] when it is paid to the complainant, and punitive when it is paid to the court . . .." Id., 485 U.S. at 632. Thus, under Hicks, this portion of the sanctions order must be characterized as punitive in nature.

Second, there was no coercive aspect to the district court's contempt order.[5] At the time the district court entered the contempt order, DuPont could no longer comply with the discovery orders because the Bush Ranch litigation had terminated. Although the district court did have the power to set aside the settlement agreement and re-open the discovery portion of the earlier case, see Chambers v. NASCO, Inc., 501 U.S. 32, 44, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 97 (1991), it chose not to do so. Where "the contemnor [can] not avoid the sanction by agreeing to comply with the original order to produce the documents," the sanctions order is determinate and therefore criminal in nature.[6] Hicks, 485 U.S. at

---

[5] The final section of the contempt order was clearly intended to coerce DuPont into complying with the order's three other sections. Thus, when considered in isolation, this part of the order could be characterized as a coercive civil sanction. However, because it was intended to coerce compliance with the other sanctions, which were punitive in nature, it must fall with the rest of the contempt order. See Hicks, 485 U.S. at 638 n.10 ("[I]f *both* civil and criminal relief are imposed in the same proceeding, then the criminal feature of the order is dominant and fixes its character for purposes of review.") (citations and internal quotation marks omitted).

[6] There is an exception to the general rule that determinacy of sanctions renders them criminal rather than civil in nature, and the Appellees argue that the exception applies in this case. In Hicks, the Court stated that "[i]f the relief imposed . . . is in fact a determinate sentence with a purge clause, then it is civil in nature." Hicks, 485 U.S. at 640 (citations omitted). The Appellees claim that the $1 million and $100 million sanctions contained in the third part of the contempt order are civil in

11

634 n.6.

We are persuaded that the sanctions imposed by the district court were neither compensatory nor coercive in nature, but instead were designed to punish DuPont for flouting the authority of the district court. Accordingly, even though DuPont and its counsel may very well have engaged in criminal acts,[7] we must reverse the contempt order because the district court did not afford DuPont the procedural protections the Constitution requires for the imposition of criminal contempt sanctions.

C.    Violation of an Order.

DuPont claims that it "cannot be held in contempt for failing to produce the Alta [data] for the simple reason that there was no order requiring [their] production." DuPont's Br. at 17. If DuPont is correct in its assertion that it was never ordered to produce the Alta data, then it cannot be held in contempt for failing to produce the Alta data during the Bush Ranch litigation. Since a ruling on this issue will either confirm or remove permanently a risk of the imposition of serious criminal contempt sanctions against DuPont, we now turn to a discussion of whether the evidence that DuPont was ever ordered to produce the Alta data is sufficient to allow this case to proceed further.

_____

nature because, even though determinate, DuPont was free to purge them by taking out ads in several newspapers confessing wrongdoing. But this publication option was itself neither compensatory nor coercive, but instead was punitive in nature. When a party must choose between two sanctions that are both punitive in nature, the character of the ultimate relief will necessarily be punitive.

[7]    In light of the serious nature of the allegations against DuPont and its counsel, we assume that the appropriate United States Attorney will shortly begin an investigation of this matter (if he or she has not already done so).

12

As previously explained, the sanctions imposed by the district court were criminal in nature. In the context of criminal contempt, the existence vel non of an order is a question for the finder of fact. See United States v. Turner, 812 F.2d 1552, 1563 (11th Cir. 1987) (listing, as one of the essential elements of criminal contempt, a finding that the district court "entered a lawful order of reasonable specificity"); see also In re McDonald, 819 F.2d 1020, 1024 (11th Cir. 1987) (holding that whether an order is reasonably specific is a question of fact which must be proven beyond a reasonable doubt to sustain a conviction for criminal contempt). Thus, in order to grant DuPont's request that we declare at this stage of the proceedings that no order requiring production of the Alta data existed, we would have to find that the record contains insufficient evidence to enable a reasonable finder of fact to conclude beyond a reasonable doubt that the district court entered a lawful order of reasonable specificity requiring DuPont to produce the Alta data. An order meets the "reasonable specificity" requirement only if it is a "clear, definite, and unambiguous" order requiring the action in question. See, United States v. Koblitz, 803 F.2d 1523, 1527 (11th Cir. 1986); Jordan v. Wilson, 851 F.2d 1290, 1292 n.2 (11th Cir. 1988); see also Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76 (1967) (union could not be held in contempt for violating order which did not clearly apply to union).

Mindful of this standard, and having undertaken a thorough review of the record, we cannot agree with DuPont that there is

13

insufficient evidence from which a reasonable finder of fact could conclude that there was a reasonably specific order requiring DuPont to produce the Alta data.  In reaching this conclusion, we have applied the familiar doctrine that the evidence is to be viewed, and all credibility issues to be decided, in the light most favorable to the charge, and all reasonable inferences drawn in support of a guilty verdict.  See, e.g., Jackson v. Virginia, 443 U.S. 316, 319 (1979); United States v. Starrett, 55 F.3d 1525, 1541 (11th Cir. 1995); United States v. Perez, 956 F.2d 1098, 1101 (11th Cir. 1992). Of course, we do not mean, by our ruling on this issue, to predetermine the outcome of the criminal contempt proceeding. More specifically, we do not mean to intimate that no reasonable finder of fact could have a reasonable doubt about the existence of a sufficiently specific order.  Rather, we merely hold that the record contains sufficient evidence from which a reasonable finder of fact could find beyond a reasonable doubt that DuPont was ordered to produce the Alta data.  We turn now to a discussion of that evidence.

The plaintiffs' first request for document production was very broad.  In it, DuPont was asked to produce, inter alia:

All documents reflecting, referencing, and/or relating to any analytical findings (including identification of peaks) from mass spectrometry [and] high performance liquid chromatography . . . in any way relating to the use and/or administration of Benlate 50 DF;

* * * *

all documents reflecting, referencing, and/or relating to any assays . . . conducted, in whole or in part, for the purpose of determining the presence, if any, of any sulfonylurea compound in Benlate 50 DF; [and]

14

* * * *

> all documents relating to and/or referencing any report or finding from any person, or entity, whether or not employed by the defendant, of other pesticidal compounds, including, but not limited to, herbicides, in Benlate 50 DF.

Plaintiffs' First Request for Production of Documents to Defendant E.I. du Pont de Nemours & Company ¶¶ 18, 55, and 65. The Alta data consist of documentation of the results of liquid chromatography testing which was done to detect the possible presence of Benlate 50 DF in soils taken from the plaintiffs' nurseries. Thus, the request for production of documents would appear to cover the Alta data. Nevertheless, DuPont argues that this request for production of documents could not include the Alta data, both because the district court treated materials generated by non-testifying experts differently from materials generated by testifying experts and non-experts, and because the Alta data were generated long after the first request for production of documents was prepared. These arguments are not strong enough to establish DuPont's position as a matter of law; a reasonable factfinder could reject them.

There is no phrase in the request for document production suggesting that the plaintiffs intended or desired for the request to be limited to documents produced by testifying experts or by non-experts. In addition, there is no phrase in the request suggesting that the plaintiffs intended or desired the request to be limited to documents in existence on or before the date DuPont

15

received the document request.[8]  Thus, a reasonable finder of fact could conclude beyond a reasonable doubt that this request, on its face, covered the Alta data.

DuPont raised a number of objections to this request for production, each of which was subsequently overruled by the district court.  In particular, DuPont claimed that it was not required to turn over the requested documents because the discovery request sought "information or materials which have been gathered or prepared in anticipation of or in the course of litigation, or which otherwise is subject to [the] work-product doctrine." Memorandum Opinion and Order on Plaintiffs' Motion to Compel Discovery Dated June 24, 1992, at 3.  The district court noted that DuPont had failed to make timely and specific claims of privilege and specifically overruled DuPont's "objections to producing documents involving Benlate claims and lawsuits and tests that Defendant has conducted since March, 1991."  Id. at 17 (emphasis

---

[8]  Although one might intuitively think that the request for production contains an implicit limitation to documents produced on or before the date the request for production was issued,  there is the following language in Rule 26:

> A party who has . . . responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:
>
> > (1) . . . if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed. R. Civ. P. 26(e) (emphasis added).  Thus, when a party generates responsive documents which render incomplete or incorrect earlier disclosures, it has an obligation to inform the opposing party of the new material.

added). Nevertheless, the district court reserved ruling on DuPont's claims of work product protection to give DuPont yet another opportunity to present adequately its claims of privilege on or before June 30, 1992. In addition, the district court specifically ordered DuPont to go back and review the plaintiffs' first request for production of documents and to answer each request fully within 15 days from the date of the district court's order. See id. at 18.

On June 30, 1992, DuPont filed a 498-page privilege log with the district court listing documents that it wanted to withhold on grounds of attorney-client privilege and/or the work product doctrine. See Supplemental Order Dated September 25, 1992, at 3. DuPont also noted its intention to withhold four categories of documents that were not individually logged. One of these categories of non-individually logged documents was described as "documents generated during ongoing testing conducted in 1992 by defendant with outside experts retained to evaluate crop damage claims and to determine the causes of damage." Id. The district court then made the following statement:

> This Court concludes that defendant's expressed intent to raise additional claims of such privileges and protections, long after its responses to plaintiffs' first interrogatories and plaintiffs' first request for production were due and long after the June 30, 1992, date upon which this Court directed defendant to file a detailed log specifically setting forth any and all claims of attorney-client privilege and work-product protection, is contrary to applicable law as set forth above and in violation of this Court's directives.

Id. at 21. The district court further stated:

> [T]he Court has determined that management of these

17

> cases, consolidated for the purpose of discovery, must not be further delayed by the non-production of documents by this defendant, nor by a continued delayed filing of claims of attorney-client privilege and work-product protection. <u>The consequences to this defendant, if any, resulting from the rulings herein made, will result solely from the failure of this defendant to respond timely to the plaintiffs' discovery requests.</u>

<u>Id.</u> at 26 (emphasis added).

As a result of DuPont's refusal to review its documents and make adequate claims of work product protection, the district court issued an order to apply throughout the <u>Bush Ranch</u> litigation that no further claims of work product protection asserted by DuPont would be entertained unless DuPont made a showing of extraordinary need. <u>Id.</u> at 27-28 ("The matter here considered will be limited to <u>the question of the plaintiffs' first discovery requests</u> directed to the defendant and the question of whether the defendant, by its acts and conduct, has waived the right to file any further claims of attorney-client privilege or work-product protection as to individual documents responsive to those discovery requests. . . . Only an assertion of privilege by defendant upon a showing of extraordinary need will be hereafter considered.") (emphasis added). Thus, a reasonable finder of fact could conclude beyond a reasonable doubt that the district court, by order, specifically altered the general process contained in Rule 26 for addressing claims of work product protection relating to documents prepared by DuPont in anticipation of litigation.[9]

---

[9] The procedure adopted by the district court--viz., requiring the non-producing party to identify documents withheld under a claim of work product protection before forcing the party seeking production to make a showing of substantial need for the documents--is substantially in line with an amendment to Rule 26 adopted

18

As a result of DuPont's abuse of the discovery process, the district court set up a special procedure for reviewing future work product claims by DuPont. A reasonable finder of fact could well conclude that DuPont's attorneys were clever enough to figure out the import of the district court's enunciated procedure for reviewing all future claims of work product protection in the case. Indeed, after the district court adopted this procedure, it specifically ordered DuPont to go back and review its responses to the plaintiffs' first request for document production and to fill in immediately "all gaps in documents responsive to Plaintiffs' original discovery requests." Order Imposing Sanctions Dated March 15, 1993, at 4 (emphasis added). Significantly, the Alta data were generated only a couple months after the district court issued its gap-filling order.

We do recognize that there is evidence in the record which could cause a factfinder to have a reasonable doubt about the existence of a clear, definite, and unambiguous order requiring DuPont to produce the Alta data. For example, DuPont points to a

_____

shortly after the termination of the Bush Ranch litigation. See Fed. R. Civ. P. 26(b)(5) ("When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.").

Arguably, the content of subdivision (b)(5) was already implicit in the scheme of Rule 26 at the time of the Bush Ranch litigation. At any rate, the question before this court is not what the Federal Rules of Civil Procedure required DuPont to produce, but instead what a reasonable finder of fact could conclude that the district court ordered DuPont to produce. If the district court's order to produce the documents sought in the first request for document production was clear, then DuPont was not entitled to decide unilaterally to disregard the order simply because it did not track precisely the procedure set up in Rule 26.

19

joint motion, signed by plaintiffs' lead counsel and submitted to the district court upon settlement of the case which states that "Plaintiffs have agreed that, during the course of the case, DuPont did come in compliance with the Court's Orders and its discovery obligations." Joint Motion and Supporting Memorandum of Plaintiffs and Defendant for an Order Vacating Prior Discovery Orders and Sanctions Dated August 16, 1993, at 3. As noted by DuPont, it is undisputed that Neal Pope, the lead counsel for the plaintiffs, signed that joint motion at a time when he knew that the Alta data had not been turned over during the course of discovery. We agree with DuPont that Mr. Pope's written representation, as an officer of the court, that DuPont had complied with its discovery obligations is evidence in its favor. But it is not conclusive evidence.

A factfinder is entitled to make credibility determinations, and we are not prepared to rule out the possibility that a reasonable factfinder might find that, notwithstanding his obligations as an officer of the court, Mr. Pope's representations were less than literally true and were made as a matter of expedience to ensure the success of the settlement. We hope that expedience and deliberate misrepresentation is not the explanation; if, however, that turns out to be the case, the district court should take appropriate action. It may be that there is a satisfactory, innocent explanation for the inconsistency between Mr. Pope's representations to the district court on behalf of the plaintiffs in the settlement agreement, and the position plaintiffs

have taken in this proceeding, but we leave that matter to further development upon remand. The district court should insist upon an explanation, and the factfinder can make the necessary credibility determinations about any explanation that is offered.

For present purposes, it is enough to view all of the evidence, make all of the credibility decisions, and draw all of the reasonable inferences in favor of the contempt charge. Doing that, we conclude that a reasonable finder of fact could conclude beyond a reasonable doubt that the plaintiffs' first request for production of documents covered the Alta data. In addition, a reasonable finder of fact could conclude beyond a reasonable doubt that the district court overruled DuPont's objections to that request and ordered DuPont to produce the Alta data. In sum, we hold that a reasonable finder of fact could conclude beyond a reasonable doubt that the district court entered a lawful order of sufficient specificity commanding DuPont to produce the Alta data and that it willfully failed to obey that order.

## V. Conclusion

For the foregoing reasons, we reverse the contempt order and remand this case to the district court for further proceedings consistent with this opinion.

REVERSED and REMANDED.

21