**STEIN INDUSTRIES, INC. and
Six Corners Development
Company, Plaintiffs,**

v.

**JARCO INDUSTRIES, INC., Defendant.**

**No. 96–CV–1162 DRH ETB.**

United States District Court,
E.D. New York.

Jan. 8, 1999.

Allan A. Fanucci, Pennie & Edmonds, New York City, Jonathan A. Marshall, Pennie & Edmonds, New York City, James G. Markey, Pennie & Edmonds, New York City, for Stein Industries Inc, plaintiffs.

Max Chopnick, Conner & Chopnick, New York City, for Jarco Industries Inc, defendant.

## MEMORANDUM OPINION AND ORDER

BOYLE, United States Magistrate Judge.

The court is again presented with the ongoing family dispute among the three Stein brothers, who are in the business of manufacturing and selling commercial popcorn and nacho chip warmers. Stuart Stein is the president, and Andrew Stein is the vice-president of the plaintiff company, Stein Industries, Inc. ("Stein" or "plaintiff"). Jeffrey Stein, formerly an officer and employee of the plaintiff Stein, is the president of the competing defendant company, Jarco Industries, Inc. ("Jarco" or "defendant"). Stein has moved to hold Jarco in contempt of the permanent injunction, dated July 29, 1997.

Defendant opposes the motion, and moves to set aside the stipulated order and permanent injunction based on newly discovered evidence. *See* Fed.R.Civ.P. 60(b)(2).

*Jurisdictional Threshold Issue*

█ The court *sua sponte* raises the issue of whether this court has jurisdiction to exercise contempt powers, which is part of the powers inherent in district judges pursuant to Article III of the Constitution of the United States. This is a case where the parties have conferred jurisdiction on the undersigned through their consent executed pursuant to 28 U.S.C. § 636(c). That section, in relevant part, states:

> (c) Notwithstanding any provisions of law to the contrary—
>
> (1) Upon the consent of the parties, a full-time United States Magistrate ... may conduct any or all proceedings in a jury or non-jury civil matter and order the entry of judgment in the case, when specifically designated to exercise such jurisdiction by the district court ... he serves.
>
> \* \* \* \* \* \*
>
> (3) .... The consent of the parties allows a magistrate designated to exercise civil jurisdiction under paragraph (1) of this subsection to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.

Other provisions relating to magistrate judge jurisdiction provide that when conduct constituting contempt is committed in a proceeding where a magistrate judge is presiding, the latter's jurisdiction is limited to investigating and certifying the relevant facts and referring the matter to the district court, if further proceedings are warranted.

> (e) In a proceeding before a magistrate, any of the following acts or conduct shall constitute a contempt of the district court for the district wherein the magistrate is sitting: (1) disobedience or resistance to any lawful order, process or writ; (2) misbehavior at a hearing or other proceeding, or so near the place thereof as to obstruct the same; (3) failure to produce, after having been ordered to do so, any perti-

nent document; (4) refusal to appear after having been subpoenaed or, upon appearing, refusal to take the oath or affirmation as a witness, or, having taken the oath or affirmation, refusal to be examined according to law; or (5) any other act or conduct which if committed before a judge of the district court would constitute contempt of such court. Upon the commission of any such act or conduct, the magistrate shall forthwith certify the facts to a judge of the district court and may serve or cause to be served upon any person whose behavior is brought into question under this section an order requiring such person to appear before a judge of that court upon a day certain to show cause why he should not be adjudged in contempt by reason of the facts so certified.

28 U.S.C. § 636(e).

It is then the responsibility of the district judge to hear and to determine whether such conduct constitutes contempt and, if so, to impose an appropriate punishment:

> A judge of the district court shall thereupon, in a summary manner, hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a judge of the court, or commit such person upon the conditions applicable in the case of defiance of the process of the district court or misconduct in the presence of a judge of that court.

*Id.*

Pursuant to the authority conferred in 28 U.S.C. § 636(c), I have directed entry of a final judgment herein, which includes the permanent injunction, which gives rise to this proceeding. Subdivision (c) does not make any express reference to authority to punish for contempt, although it does authorize a magistrate judge to "conduct any or all proceedings in a jury or non-jury civil matter and order the entry of judgment in the case, ...." The magistrate judge's powers concerning contempt are expressly delineated in subdivision (e), quoted above, and limit the magistrate judge's jurisdiction *to certifying*

the facts relevant to any contemptuous conduct to the district judge for final determination.

I note that magistrate judge contempt authority was part of the Federal Courts Improvement Act of 1998, which Congress failed to pass. That bill—requested by the United States Judicial Conference—sought to amend subdivision (e) of 28 U.S.C. to provide magistrate judges with limited summary criminal contempt authority and civil contempt authority in civil consent cases and misdemeanor cases. H.R. 2294, 105th Cong. § 202 (1998). *See also Judicial Conference of the United States Long Range Plan for the Federal Courts,* December 1995, Recommendation 66, 166 F.R.D. 53, 162 (1996) ("magistrate judges should be vested with limited contempt power to punish summarily for misbehavior committed in their presence and to punish for disobedience or resistance to their lawful orders in civil cases referred to them with the consent of the parties.").

Thus, while the parties here have consented to my exercising jurisdiction under § 636(c), the consent by them cannot authorize me to proceed beyond the authority conferred therein. The powers conferred under § 636(c) do not vest me with all the powers conferred under Article III of the Constitution. Certain powers are reserved. A magistrate judge is authorized to try a civil case with the parties' consent only "when specially designated" to do so by an Article III judge. 28 U.S.C. § 636(c)(1). Moreover, the method of appointment and removal provision, applicable to magistrate judges appointed under Article I of the Constitution, as well as the withdrawal of the magistrate judge reference, remain the exclusive responsibility of the district court. *See* 28 U.S.C. §§ 631(a) and (i) and 636(c)(6). Were it not for this reservation of authority, 28 U.S.C. § 636(c) would be considered an "impermissible incursion (by Congress) into judicial power." *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion holding that section 241(a) of the Bankruptcy Act of 1978, 28 U.S.C. § 1471, impermissibly removed "most, if not all, of 'the essential attributes of judicial power' from the Article III district court, and ... vested those attributes in a non-Article III adjunct." *Id.* at 87, 102 S.Ct. at 2880. *See also Collins v. Foreman,* 729 F.2d 108, 114–18 (1984) (28 U.S.C. § 636(c) does not impermissibly allow district judges to place magistrate judges under the control of the legislative and executive branches of government due to the reservation of Article III powers which have not been delegated under this provision).

The Court of Appeals in *Collins* sustained the constitutionality of the delegation of authority under 28 U.S.C. § 636(c). While the court did not expressly rely on the district court's non-delegation of contempt authority in upholding the statute, the Court of Appeals noted that "under section 636(c) references, the contempt powers remain with the district court." *Collins,* 729 F.2d at 117.

In *Proctor v. State Government of North Carolina,* 830 F.2d 514 (4th Cir.1987) the court addressed the contempt powers of the magistrate judge in a situation similar to the one here. The parties had consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c), and thereafter the parties agreed to the entry of a consent decree by that judge. The plaintiff sought to enforce the consent order by holding the State in contempt. The magistrate judge conducted a hearing and concluded that the consent order had been violated and that such conduct constituted a contempt under 28 U.S.C. § 636(e). Pursuant to § 636(e) the magistrate judge so certified the facts to the district court and ordered the State to appear before the district court to show cause why it should not be held in contempt. The issue on appeal was whether the district judge was bound by the findings of fact made by the magistrate judge and whether precluding the introduction of other evidence was proper. The court reversed and remanded on the ground that the preclusion of additional evidence contradicted the statutory provision that the district judge "shall ... hear the evidence." 28 U.S.C. § 636(e). The court concluded that the "certificate of facts forwarded by the magistrate to the district court shall be considered the statement of a prima facie case" and that a party should be afforded "the opportunity to

introduce evidence [to the district judge] upon request." *Id.* at 522.

For this reason, I will treat the evidentiary hearing held herein as a hearing conducted pursuant to 28 U.S.C. § 636(e) to determine whether I should certify the defendant's conduct—alleged to be in contempt of the permanent injunction—to a judge of the district court for further proceedings pursuant to 28 U.S.C. § 636(e). *See e.g., Gomez v. Scoma's Inc.,* 1996 WL 723082 (N.D.Cal.1996) ("The duty of the magistrate under this provision (636(e)) is simply to investigate whether further contempt proceedings are warranted, not to issue a contempt order." *Id.* at 3). *See also In re Kitterman,* 696 F.Supp. 1366 (D.Nev.1988) (after a hearing the magistrate judge found no valid ground for an order of contempt, and refused to certify the matter to the district court for further proceedings. *Id.* at 1370).

## FACTS

On March 14, 1996, Stein filed a complaint against Jarco for infringing on U.S. Patent No. 4,850,120 (the " '120 patent") and U .S. Patent No. 5,123,178 (the " '178 patent"). The patents relate to popcorn and nacho food warming devices, often found in movie theaters and stadiums. On July 29, 1996, following an evidentiary hearing, the court granted plaintiff's motion for a preliminary injunction, and enjoined Jarco from manufacturing, using and selling Jarco's Pronto Pre–Pak Warmer and Pronto Chip/Cheese Warmer protected by Stein's '120 and '178 patents. *Stein Industries, Inc. v. Jarco Industries, Inc.,* 934 F.Supp. 55 (E.D.N.Y.1996).

The parties subsequently agreed to a permanent injunction, which prohibits Jarco from "making, advertising, using, offering for sale, selling or distributing in any manner the Pronto Pre–Pak Warmer having the structure as made by Jarco in March 1996, the Pronto Chip/Cheese Warmer having the structure as made by Jarco in March 1996 or any other product incorporating the structures set forth in claim 1 of either the '120 or '178 patent." *See Stipulated Order and Permanent Injunction,* dated July 29, 1997, at 2, ¶ 3.

The underlying settlement agreement, for reasons that are unclear, in relevant part, prohibited only the "manufacture and sale" of any infringing product:

> Simultaneously with the execution of this Agreement, Stein and Jarco will execute and file in the United States District Court for the Eastern District of New York a Stipulated Order and Permanent Injunction permanently, during the respective terms of the patents-in-suit enjoining Jarco's manufacture and sale of the Pronto Pre–Pak Warmer and the Pronto Nacho Chip/Cheese Warmer having the structures as made by Jarco in March 1996, or any other product incorporating the structures set forth in Claim 1 of either of the patents-in-suit; and dismissing Stein's Complaint and Jarco's Counterclaims with prejudice . . . .

*Settlement Agreement,* dated June 24, 1997, at 2, ¶ 1.

The motion to hold Jarco in contempt of the permanent injunction arises from Jarco's use, at a trade show, of a delux warmer, which is nearly identical in appearance and function to Jarco's permanently enjoined warmer and which incorporates the structures set forth in Claim 1 of the '120 patent. *See Stein Post Hearing Brief,* at 2. Stein maintains that the violation occurred in October 1997 at the Trade Show East in Atlantic City, New Jersey. An evidentiary hearing was held in May 1998, at which the machine at issue ("trade show warmer") was produced.

Andrew Stein, vice-president of Stein and the inventor of the unit covered by the '120 patent, testified that Trade Show East is a yearly event and the largest trade show on the East Coast for concession suppliers where hundreds of companies exhibit and sell their products to theater operators. Tr. 14. He stated that in October 1997, Stein operated a booth at the Trade Show East to promote and sell its products. Tr. 13. He observed that Jarco shared a booth at the Trade Show East. The alleged infringing trade show warmer was observed in Jarco's booth at the show. Tr. 14; Exh. 71, 73–77. Andrew Stein stated that the trade show warmer was being used to display food, Tr.

22, and that the lower compartment contained bulk chips in the "bulk warming compartment." Tr. 23, and the upper compartment contained individualized portions of chips. Tr. 24. Andrew Stein further stated that the only difference between the trade show warmer, *see* Exh. 73, and Jarco's enjoined food warmer, the Pronto Pre–Pak Warmer, *see* Exh. 70, 107, 108, was that the enjoined warmer was larger in height. Tr. 29. Andrew Stein stated that the airflow in the trade show warmer, as well as the airflow in the Pronto Pre–Pak Warmer, function in an identical manner, and that when the machines are in use, the hot air rises from the bottom floor of the lower compartment, through the common wall into the upper compartment, and then returns to the heating assembly through the holes in the conduit in the upper compartment, where it is blown out. Tr. 42. Andrew Stein also testified that the trade show warmer—like the Pronto Pre–Pak Warmer—has two sets of doors, one set to access the bulk food and a separate set of sliding glass doors to access solely the individualized portions, thereby minimizing the escape of heated air. Tr. 44. The court credits the testimony of Andrew Stein.

Jarco shared booth space of at the trade show with another company, Great Western, a manufacturer, processor and distributor of concession supplies. Tr. 78–79. Portions of the deposition testimony of Ralph Ferber, Great Western's Vice President of Sales and Marketing, were admitted into evidence. Mr. Ferber stated that Great Western paid for the cost of the booth, which was $3,000 for three days. Tr. 83–84. He stated that there were no signs in the booth indicating that Great Western occupied the booth, however, there was a poster in the booths with Jarco's name. Tr. 85. Jarco made no cash contribution to Great Western for its use of the booths, however, Jarco contributed the trade show warmer to Great Western for the display of Great Western's nacho and cheese products. Exh. 1, *Def.'s Response to Interrogatories Regarding Pltffs' Mot. for Contempt.* Ferber stated that the nacho trade show warmer was provided by Jarco after he had asked Jeffrey Stein if Jarco had something that Great Western could use to warm chips. Tr. 89–90. Ferber also stated that

Jeffrey Stein had told him at that time "there was a problem with him and his brothers regarding this machine and that [Great Western] could not sell it, nor was he going to try to sell it, but [Great Western] could use it...." Tr. 91. At the end of the Trade Show East, the trade show warmer was returned to Jarco's offices where it remains. Tr. 92–93. There is no evidence that the trade show unit was ever offered for sale. The court credits the deposition testimony of Ralph Ferber.

Jeffrey Stein, the president of Jarco Industries, Inc., testified that he had designed the trade show warmer. Tr. 102. He stated that the food warmer was built three to eight years earlier, tr. 104. He confirmed that Jarco had provided the trade show warmer to Great Western for its use at the trade show in October 1997, and that he had instructed Ralph Ferber not to sell it. Tr. 111–12, 118. The court credits this testimony.

Michael Carlin, the foreman for Jarco and the person responsible for designing its equipment for the past nine years, acknowledged that the return air flow in the enjoined Pronto Pre–Pak Warmer did not differ from the return air flow in the trade show warmer. Tr. 140–141, 146

Stuart Stein, the president of Stein Industries, testified concerning the presence of all of the elements of Claim 1 of the '120 Patent in the trade show warmer. Tr. 171. He testified that the unit contained a "first storage compartment" for bulk food, a "second storage and display compartment" for individualized food, and a metal shelf between the first and second compartments, as set forth in claim 1. Tr. 170–71. He also testified that, as set forth in Claim 1, the unit contained a stainless steel chimney on the side allowing for the air to rise through the holes on the top of the chimney and the second compartment, and allowing the air to circulate back down into the chamber where the heating element is located with a blower and thermostat. Tr. 173. He also testified that the trade show warmer contained a first and second compartment that can be separately accessed, through sliding stainless

steel doors, and that the unit contained two separate sets of doors to minimize the escape of heated air while in use, also consistent with claim 1 of the '120 Patent. Tr. 173–74. He stated that the only structural difference between the enjoined Pronto Pre–Pak Popcorn Warmer and the trade show warmer was that the trade show warmer had one, rather than three shelves. Tr. 175. The court credits the testimony of Michael Carlin and Stuart Stein.

## DISCUSSION

### I. STEIN'S MOTION FOR CONTEMPT

■ A party may be held in civil contempt of an order where (1) the order the party allegedly failed to comply with is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the party has not diligently attempted in a reasonable manner to comply with the order. *See New York State Nat'l Organization for Women v. Terry,* 886 F.2d 1339, 1351 (2d Cir.1989).

### A. The Order is Clear and Unambiguous

■ Jarco argues that the permanent injunction is ambiguous because (1) the trade show warmer was constructed prior to the commencement of the underlying action and prior to entry of the order of permanent injunction and (2) because the settlement agreement only prohibited the manufacture and sale of an enjoined device.

Jarco's argument is devoid of merit. The fact that the trade show warmer was designed and manufactured prior to the entry of the permanent injunction does not render the injunction "unclear." While there is a difference in the language of the settlement agreement and the permanent injunction to which both parties stipulated, the permanent injunction enjoins Jarco from "making, advertising, *using,* offering for sale, selling or distributing in any manner any other product incorporating the structures set forth in claim 1 of either the '120 or '178 patent." *See Stipulated Order and Permanent Injunction,* dated July 29, 1997 (*emphasis added*). There is no evidence that Jarco sold, promoted or advertised the trade show warmer in violation of the permanent injunction. The delivery of the trade show warmer to Great Western for the latter's use for displaying and promoting its products constitutes "using" under the terms of the permanent injunction. The court finds nothing unclear or ambiguous in the terms of the permanent injunction.

Stein has adequately established that the trade show warmer is a merely colorable version of the enjoined warmer in which all of the elements of Claim 1 of the '120 Patent are present. Accordingly, the first prong is established.

### B. Insufficient Proof of Disobedience

■ While Stein has established a violation of the "using" prohibition of the permanent injunction, the violation is insufficient to warrant contempt. The main thrust of the permanent injunction is to prohibit Jarco from further competitive acts of infringement in the manufacture and sale of warmers, in violation of Stein's '120 Patent. The conduct of Jarco in permitting Great Western's use of its warmer during the trade show did not constitute a material violation of the consent decree. Its conduct constitutes a *de minimis* violation of the consent judgment. It resulted in no economic injury to Stein. It was a single act—never repeated. Moreover, the evidence shows that Jarco's president—conscious of the main purpose of the permanent injunction—took reasonable and diligent steps to ensure that the manufacture and sale provisions of the injunction—which, as noted above, constitute the essence of the order—were fully honored by Great Western and otherwise complied with. There is no evidence that Jarco used the warmer to in any way promote its line of products. Jarco simply loaned the warmer to Great Western for the latter's use so that it could exhibit its product and serve heated nachos at the trade show. There is no evidence that Jarco acted in bad faith. To the contrary, the evidence shows that Jarco's president mistakenly relied upon the language of the settlement agreement which did not include the prohibition against "using" an infringing product, which gives rise to the violation here. The court further notes that the language of the settlement agreement (prohibiting "manufac-

ture and sale") provided that that same language would be incorporated into the consent decree. For reasons that Stein has not explained, the consent decree presented to the court included the expanded "using" prohibition which gives rise to this application for contempt.

■ The contempt power is a grave responsibility and a "potent weapon," *International Longshoremen's Assn. v. Philadelphia Marine Trade Assn.,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967), which should not be used "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *California Artificial Stone Paving Co. v. Molitor,* 113 U.S. 609, 618, 5 S.Ct. 618, 622, 28 L.Ed. 1106 (1885).

The facts presented here are insufficient to warrant certification to the district court, pursuant to 28 U.S.C. § 636(e).

## II. *JARCO'S MOTION TO VACATE THE PERMANENT INJUNCTION*

Pursuant to Rule 60(b)(2), Jarco moves for relief from the Stipulated Order and Permanent Injunction, as well as the Settlement Agreement, on the ground of newly discovered evidence. Jarco claims that it has located a Deluxe Warmer in Sanford, North Carolina, which constitutes prior art and "clearly shows that the '120 patent should be declared void based upon anticipation and/or obviousness and/or lack of candor to the Patent and Trademark Office during the application process." *Jarco Mem. In Supp. of Mot. for Relief,* at 1. Stein opposes the motion, arguing that Jarco was not diligent in the underlying proceeding in locating this prior art, that the warmer is merely cumulative of the evidence considered previously, and that this product would not affect the outcome of this case.

Rule 60(b)(2) of the Federal Rules of Civil Procedure provides, in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not

have been discovered in time to move for a new trial under Rule 59(b). . . .

FedR.Civ.P. 60(b)(2).

■ Under Rule 60(b)(2), a party seeking relief must demonstrate that (1) the newly discovered evidence consists of facts which existed at the time of the prior decision; (2) the moving party is excusably ignorant of the facts even though it used due diligence to learn of them; (3) the newly discovered evidence is admissible and will likely change the result of the prior ruling; and (4) the newly discovered evidence " 'is not merely cumulative of evidence already offered.' " *Rand International Leisure Products, Ltd. v. Tek-Source, L.C.,* 1998 WL 372356, at * 1 (E.D.N.Y. July 2, 1998) (quoting *Tufts III v. Corporation of Lloyd's,* 981 F.Supp. 808, 812 (S.D.N.Y.1996) (citations and quotations omitted)).

■ I find that this issue was raised by Jarco at the preliminary injunction hearing, and further that the warmer in Sanford, North Carolina, is evidence that is merely cumulative in nature. In granting the plaintiffs' motion for a preliminary injunction, this court determined that "the Deluxe Warmer (belonging to Jarco) is sufficiently different from the subjects of the patents at issue ... [and] that the defendant has failed to make an adequate showing that the claims of the two patents were made obvious by the prior art." 934 F.Supp. 55, 57–58 (E.D.N.Y.1996). A further finding was made that "[t]he design of the Deluxe Warmer varies too much from the claimed design in the patents and did not anticipate the inventions." *Id.* at 58. Jarco therefore cannot use Rule 60(b)(2) to relitigate an issue that has been previously decided, where the evidence presented is "merely cumulative" in nature. *See Mancuso v. Consolidated Edison Co. of New York,* 905 F.Supp. 1251, 1265 (S.D.N.Y.1995) (denying relief under 60(b)(2) where "newly advanced evidence that supports ... consistently advanced theory ... is merely cumulative"). Moreover, Jarco never appealed the preliminary injunction order and thereafter voluntarily entered into a settlement agreement and consent decree to resolve this litigation. Jarco has waived its right to challenge the validity of

Stein's patents herein. *See Interspiro U.S.A., Inc. v. Figgie International,* 815 F.Supp. 1488, 1503 (D.Del.1993) (concluding that in signing settlement agreement, defendant waived right to challenge validity and enforceability of the patent).

Lastly, even if the prior art had not been raised at the preliminary injunction hearing, the consent judgment entered herein established for purposes of this litigation that Stein's patents were valid and that Jarco's product infringed those patents. *Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.,* 154 F.3d 1345, 1350, 47 U.S.P.Q.2d 1906, —— (Fed.Cir.1998) (by not contesting infringement in the original proceeding the defendant conceded patent validity and enforceability and "validity and infringement by the original device were not open to challenge.").

Accordingly, defendant's motion to vacate the stipulated order and permanent injunction, and the settlement agreement is denied.

## CONCLUSION

For the foregoing reasons, the court (1) pursuant to 28 U.S.C. § 636(e) declines to certify to the district court that Jarco's conduct constitutes contempt under 28 U.S.C. § 636(e)(1) ("disobedience or resistance to ... [a] lawful order...."); (2) denies Jarco's motion to set aside the stipulated order and permanent injunction and the settlement agreement herein; and (3) in all other respects denies Stein's request for relief herein.